JEROME MARBLE & others *vs.* STANDARD OIL COMPANY.

Worcester.    October 4, 1897. — November 24, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & MORTON, JJ.

*Contract — Breach — Indefiniteness — Termination.*

There is no evidence in this case of the breach of any contract alleged in the declaration.

A conversation between the seller and buyer of goods, which contains nothing more definite than an agreement that the seller will deal with the buyer in such a way as to protect his trade, discloses an arrangement which is too indefinite and too general to be enforceable as a contract.

Open and notorious acts by one party to an agreement, known to the other, which are inconsistent with the longer continuance of it, may be considered a termination of it, if it was to continue only during the pleasure of the parties and called for no formal notice to terminate it.

CONTRACT, in five counts.   The first count alleged an agreement by the defendant not to interfere with the plaintiffs' sale of oil in Worcester and its vicinity, by itself selling certain brands named within the same territory, from tank wagons or otherwise, to retailers and consumers of the defendant's oil.   The second count alleged an agreement by the defendant to sell the plaintiffs all kinds of refined oils at such a price as to make the price to the plaintiffs one fourth of a cent per gallon less than the price at which it should sell the same quality of oil to E. T. Smith and Company, the plaintiffs' competitor.   The third count alleged an agreement by the defendant not to interfere with the plaintiffs' trade, nor sell nor offer for sale refined oils to persons or corporations who were customers of the plaintiffs. The fourth count alleged an agreement by the defendant to pay the plaintiffs one fourth of a cent per gallon for all oil which the defendant should sell to any of the customers of the plaintiffs. The fifth count alleged an agreement by the defendant not to interfere in any manner with the plaintiffs' trade in connection with a certain brand of oil, nor to sell or offer for sale this particular brand to any of the plaintiffs' customers, so long as the plaintiffs continued to sell such brand.   The considerations stated in the several counts were substantially that the plaintiffs would purchase all their kerosene or refined oil, or purchase exclusively oil of the defendant, and sell their customers only oil purchased of the defendant.   All the counts alleged breaches by failure to perform the respective agreements.

Trial in the Superior Court, before *Hopkins*, J., who reported the case for the determination of this court, in substance as follows.

Joseph R.. Marble, called as a witness by the plaintiffs, testified that he was a member of the firm of Jerome Marble and Company, and a plaintiff in this case; that he entered the firm as a partner in 1886; that he was a salesman for the firm on the road in 1884; and that at that time the sales business of the firm in the petroleum line covered every town or station, and some towns two miles from the stations, on the Boston and Albany Railroad east from Worcester as far as Newton, and went as far as Woonsocket, Rhode Island, including that city, on the Providence and Worcester Railroad; as far as Daniel-

sonville, Connecticut, on the Norwich and Worcester Railroad; as far west as Adams on the Boston and Albany Railroad and its branch, leaving out Springfield; on the Ware River Railroad up to and including Winchendon; on the Athol branch of the Boston and Albany Railroad up to and including Athol; and including also all towns between Worcester and Fitchburg and between Worcester and Ayer on the Worcester and Nashua Railroad, and taking in Shrewsbury and Leicester and other towns not reached by railroads.

The examination of the witness was then continued as follows:

" *Q.* Do you know who was the representative in ·fact of the Standard Oil Company in New England — in Massachusetts or Rhode Island — at the time I mention? *A.* I do. — *Q.* Who was that person? *A.* George B. Burton. — *Q.* Of where? *A.* Of Providence. — *Q.* Did you have any conversation at or about the time I allude to, and either before or after you were a member of the firm, with Mr. Burton, with regard to furnishing oil to Jerome Marble and Company? *A.* I did."

The witness further testified that the conversation was in the latter part of 1884, — he could not state accurately, — at the office of the defendant in Providence, Burton's office; that he had known him as a representative in fact of the defendant during 1884 and up to the time of his withdrawal, which was 'before the commencement of this action; and that he had known Burton in that position from 1884 to 1892, to the best of his knowledge and belief.

The witness was then further interrogated as to this and other conversations with Burton, and he testified as follows: " He said, ' This is a nice arrangement for your people; you must be very careful to keep the matter of the price quiet; E. T. Smith and Company must not understand that we sell you at less price.' I said, ' Is the oil as good as that made by Luke, Holmes, and Adams? Will it stand 100 flash test?' He said, ' What do you want to know for? 110 fire test is perfectly good.' I said, ' Our city inspector, Mr. Brophy, is very particular, and insists on 100 flash test.' Soon after this, within three months, I had another conversation at Providence. Burton said, ' How are things working in Worcester?' I replied, ' Fairly well; the great thing is to keep the quality of the oil

right.' He said, ' The Standard Oil Company can make oil as well as any one. We have arranged about the 100 flash test. Brophy is too particular; be very careful not to say a word about the quarter of a cent a gallon that you have over E. T. Smith and Company. It would not do at all if that got out.' "

The witness also testified that subsequently he had talks with Burton frequently at his office, occasionally at Worcester, frequently on the cars, and once or twice in Boston; and continued as follows: " In 1887 I had a conversation with Burton in his office in Providence. I said, ' Mr. Burton, the price at which we are buying oil of you does not allow us to hold our trade in Athol. If it were not for this agreement with you by which we are to buy all our oil of you, we could buy oil of other parties and hold our trade in Athol.' He said, ' Under the agreement, you cannot buy oil of other parties; our arrangement is that you shall buy all the oil of us. We have all your trade, and we will protect you in your trade. Now, Athol is rather out of your territory; the Springfield people want that trade; you had better let them have it, holding your trade in Worcester under our agreement, by which you buy all your oil of us, and we will protect you in your trade, because we are also selling under the agreement one quarter of a cent less than E. T. Smith and Company;' and, by the way, don't let that fact get out.' I replied that if that was the case we would yield the Athol territory. We did cease doing business there, we dropped out of Athol, which in itself was a large trade, taking several car loads per month. About the same time we had another conversation about the trade in the vicinity of Danielsonville, Connecticut. I said we ought to have a price low enough to hold that trade, and Burton said, ' The Standard Oil Company want Lee and Osgood to have that trade; we can get into Norwich by water more advantageously than we can by rail through Worcester.' I said that it was very hard for us to give up that trade, to give up any of our territory or trade, that it had cost us a great deal of time, money, and trouble to establish it. He replied, ' The tendency of trade is to localize. Under our agreement, by which you buy all your oil of us, and under which we give you a lower price than is given to E. T. Smith and Company, you are making more money, and will make more money in Worcester than if you try

to fight Lee and Osgood in this territory.' I said, 'All right. We want to work in harmony with you as agreed upon.'

"I had a conversation with Burton in Boston, in the Boston and Albany Railroad station, in January or February, 1890, possibly in December, 1889, with reference to the sale of naphtha to the Worcester Gas Light Company. I said, 'You are not using us right to let the Maverick Oil Company take the trade of the Worcester Gas Light Company from us; we have worked it up, and held it at a small profit, reasonably expecting that you would continue to let us have it.' He said, 'That is all right; you've had it and you've made money on it. I do not do much with the naphtha business. You must not be too grasping. We are holding to the understanding arrived at with Mr. Drury and with you about the oil trade, and the Maverick Oil Works will have to have that business.' I said I thought it was not the right kind of treatment, but we should have to acquiesce. The last of the year 1889 in Providence I had a talk with Burton. I said, 'You are shipping us wretched oil into Clinton. We have no end of trouble with the water white oil.' He said, 'Well, the Standard Oil Company can make and will make the best water white oil on earth; we have had a little trouble; that oil is too heavy; you make the best settlement you can; you won't have to allow them very much.' I said, 'We could buy a great deal better oil of other people except for our arrangement with them.' Burton said, 'The Standard Oil Company will make oil as good as anybody, and the arrangement with us and you shall be to your benefit.' I said, 'I'll go back and make the best arrangement I can with the trade in Clinton.' I had conversations with Burton averaging once in three months."

The witness further testified as follows: "During any of the times mentioned the Standard Oil Company had no office or tank for doing business in Worcester. They established a place of business of that character in Worcester in 1891. Up to that time we bought our oil of them."

The examination of the witness was continued as follows: "Q. In any of the conversations you had with Burton at any time since 1884, was there anything said definitely about their selling oil? A. There was. — Q. Give the conversation. A. I said, 'Mr. Burton, a man in Fitchburg has built a tank station.'

—*Q.* Did you mention the man's name? *A.* 'Mr. Cross of Fitchburg has built a tank station on the line of the Fitchburg Railroad tracks in Fitchburg. I think that would be a very good thing for us.' Burton said, 'Don't you do it; it is the most expensive way of handling oil; we never did it except as a last resort; the Standard Oil Company have built one in Nashua, and they wish they had not built it; you don't need it; your arrangement with us protects you now; you are handling your oil cheaper than you could if you put up a tank station; we never should build one in Worcester except as a last resort.' I said, 'Very well.' — *Q.* When was that? *A.* In 1886, as I remember it. — *Q.* Is that all that you can recollect that was ever said in any conversation with Burton touching their selling in Worcester? *A.* No. I said, 'You are building a tank station in Springfield?' — *Q.* When was that? *A.* I cannot fix the date; it was after the Fitchburg conversation. I should say within a year. I said, 'You are building a tank station in Springfield?' He said, 'Yes; things are all mixed up there; we are going to have that trade.' I said, 'You won't encroach upon our territory?' Burton said, 'No; the trade is being handled well in Worcester; we never expect to build a tank station there.'"

The witness was asked the following question: "I will renew my question regarding the establishment of sales from tank wagons in Worcester. At any time since their establishment of a tank here in 1891, has the Standard Oil Company put road wagons on the road in Worcester?" This question was objected to. The judge excluded it; and the plaintiffs excepted.

The judge directed the jury to return a verdict for the defendant. If the direction was right, judgment was to be entered upon the verdict; otherwise, the verdict was to be set aside and a new trial ordered.

*W. S. B. Hopkins, (F. B. Smith & W. S. B. Hopkins, Jr.* with him,) for the plaintiffs.

*F. P. Goulding, (W. C. Mellish* with him,) for the defendant.

KNOWLTON, J. There was evidence that Burton was an agent who might bind the defendant by any proper contract for the sale of oil. If we assume, in favor of the plaintiffs, that some or all of the conversations relied on were in the course of his agency, so that they may be used in evidence against the

defendant, we must consider what relations between the parties they tend to show.

In none of the counts of the plaintiffs' declaration is it averred that the plaintiffs have had or were to have the sole agency for the sale of the defendant's oils, or the exclusive right to sell them in Worcester or in any other place. One of the counts is upon an alleged contract by the defendant to sell all kinds of refined oils to the plaintiffs at a quarter of a cent per gallon less than the price at which it sold to E. T. Smith and Company, the competitors of the plaintiffs. From all the evidence introduced by the plaintiffs, we understand that they were selling oil through a large territory, covering all the towns and stations except Springfield on the Boston and Albany Railroad, and the branch lines under its control between Newton on the east and Adams on the west, including some towns two miles from stations; all towns on the Providence and Worcester Railroad to Woonsocket, Rhode Island, and all towns on the Norwich and Worcester Railroad as far as Danielsonville, Connecticut, and all towns between Worcester and Fitchburg and between Worcester and Ayer on the Worcester and Nashua Railroad, including Shrewsbury, Leicester, and other towns not reached by railroads. We understand from the testimony that the plaintiffs were selling in these places in competition with other persons, some of whom bought oil from the defendant, and some from other persons or corporations. The burden of proof was on the plaintiffs, and there is no testimony which indicates that this was not so. Indeed, one of the plaintiffs testified to conversations tending to show that there was a secret agreement between the plaintiffs and the defendant's agent that the price at which the defendant should sell to them should be a quarter of a cent per gallon less than that at which it was to sell the same kinds of oil to E. T. Smith and Company; and he also testified to conversations from which it expressly appears that the defendant was selling to other persons who were to resell in Athol, and to others who were to resell in the vicinity of Danielsonville, Connecticut. The plaintiffs complain that the prices which they were obliged to pay were too high to enable them successfully to compete with other persons to whom the defendant sold in those neighborhoods.

The conversations relied on by the plaintiffs were nearly all in relation to the price and quality of oil sold to them by the defendant; and the only definite fact referred to in these conversations was the existence of an arrangement under which the defendant was selling to them at a quarter of a cent per gallon less than to E. T. Smith and Company. Beyond that there was nothing more definite than that the defendant would deal with them in such a way as to protect their trade; that is, sell to them on favorable terms, so that they could compete successfully with other parties selling in the same territory. If the arrangement in regard to the price as compared with the price paid by E. T. Smith and Company be treated as a contract, there is no evidence that there was ever a breach of it. As to the other part of the arrangement, we are of opinion that it was too indefinite and too general to be enforceable as a contract. It is manifest that the plaintiffs so considered it. When one of them complained to Burton, in 1889 or 1890, that the defendant was doing its business in such a way as to enable the Maverick Oil Company to take from them the trade of the Worcester Gas Light Company, which they had worked up, Burton replied that the Maverick Oil Company would have to have that business. The plaintiff testified, " I said I thought it was not the right kind of treatment, but we should have to acquiesce." So in the conversation with Burton, in 1886, in regard to building a tank station, Burton said that it was the most expensive way to handle oil, that the defendant had built one in Nashua and regretted it, and that they never would build one in Worcester except as a last resort. One of the plaintiffs said, " Very well." At this time the right of the defendant to build one in Worcester, if it chose, was asserted by the defendant's agent and acquiesced in by the plaintiffs. They built one five years afterwards. At another conversation within a year after the former one, the plaintiff said, " You won't encroach upon our territory ? " Burton replied, " No ; the trade is being handled well in Worcester; we never expect to build a tank station there." Here, too, the right to build a tank station in Worcester seems to have been asserted by implication, and not denied. The right of the defendant to sell to other parties in Worcester, who would sell in competition with the plaintiffs, seems never to have been ques-

tioned.  The contention of the plaintiffs is, that it had no right to sell to the plaintiffs' customers, or to interfere with their trade. But the conversation with Burton, in reference to building tank stations in Springfield, in Nashua, and in Worcester, implied that the building of a tank station naturally involved the opening of a retail business.  If so, the recognized right to build a tank station included the right to sell at retail, even if it opened a new competition with the plaintiffs.

The plaintiffs did not show, nor offer to show, that the defendant ever sold, or tried to sell, to any of their customers.  Putting road wagons on the road in Worcester was not necessarily inconsistent with carefully refraining from any interference with the customers of the plaintiffs, and with subjecting the plaintiffs to more severe competition than they encountered before.

Moreover, there was no evidence that there was ever any agreement that the arrangement was to continue for any particular time.  The plaintiffs were never bound to buy their oil from the defendant for a single day longer than they chose to. So far as appears, the arrangement was to continue only during the pleasure of the parties.  It called for no formal notice to terminate it.  There is no ground for a contention that it would continue in force after open and notorious acts by one party, known to the other, which were inconsistent with the longer continuance of it.  The building of a tank station in Worcester, and the procurement of road wagons for sales at retail there, while the plaintiffs were living and doing business in that city, were acts of a notorious character, and were an expression of a purpose to terminate the arrangement, if there was an arrangement, not to sell oil at retail there.  After the arrangement had come to an end, the defendant might sell as it chose.  The only breach of an alleged contract that the plaintiffs offered to prove at the trial was the making of sales from the wagons after the construction of a tank station in Worcester.

We are of opinion that there was no evidence of liability under either of the contracts set out in the declaration.

*Judgment on the verdict.*