TROY E. HARDMAN *v.* SAM G. POLINO *et al.*

(No. 7433)

Submitted January 24, 1933.   Decided February 28, 1933.

*D. H. Hill Arnold* and *A. E. Fiorentino,* for plaintiffs in error.

*S. T. Spears* and *E. L. Maxwell,* for defendant in error.

KENNA, JUDGE:

The plaintiff, Troy E. Hardman, was the owner of three tracts of land, one of 400 acres known as the Maple Springs farm, located in Randolph County, one of 617 acres known as the Kings Run farm, located in the same county, and one of 210 acres, located in Upshur County. There were deeds of trust on all three in favor of Virginian Joint Stock Land Bank of Charleston, West Virginia. An involuntary proceeding in bankruptcy was brought against the plaintiff and these lands were all sold therein in June, 1931, subject to the deed of trust liens and were purchased, for nominal amounts, by the Virginian Joint Stock Land Bank acting through D. Hill Arnold as agent or trustee, who took the legal title. The Land Bank then set about to get its money out of the farms by re-sale. Plaintiff had a verbal understanding with the Virginian Joint Stock Land Bank that by paying the amount of the deeds of trust together with interest and taxes advanced by it, he might cause the lands to be conveyed to him. He was negotiating with former Governor Howard M. Gore, and perhaps with others, for the purpose of obtaining the necessary funds to take advantage of his understanding with the bank in a manner that would enable him to retain or to procure an interest in the lands after they had been redeemed from the bank. None of these negotiations, according to the record, seem to have proceeded to a discussion of terms and conditions. In June, 1931, plaintiff met the defendant, A. J. Colborn, in Elkins, and in a discussion of plaintiff's affairs, particularly as they affected the three farms in question, Colborn suggested that he, Colborn, had a friend that he thought might be interested. This proved to be the defendant, Sam G. Polino. After some preliminary discussions, an agreement was arrived at between the plaintiff, Colborn, and Polino for the redemption or purchase of the three farms from the Virginian Joint Stock Land Bank. A dispute over the terms, construction, and consequences of this agreement gives rise to this litigation.

Virtually it is agreed that the understanding contemplated that the defendants Polino and Colborn would supply sufficient money to form a corporation to be known as Maple Springs Farms, Inc., meet the cash requirements of the Vir-

ginian Joint Stock Land Bank in the matter of redeeming the land and paying up the taxes, supply the farms with equipment and stock, treat their advancements as a debt against the corporation, and at some time cause one-third of the stock of the corporation to be vested in the plaintiff Hardman. The further effect of the agreement is the matter in dispute. The plaintiff Hardman contends, on the one hand, that the defendants agreed, among other things, that they would supply money without limit but merely estimated to be between $15,-000 and $20,000, for the purpose of enabling the corporation to acquire and operate the farms. The defendants, on the other hand, contend that they agreed to advance, for the purposes outlined, a sum of money not to exceed between $12,000 and $15,000.

After having supplied a sum of money, the amount of which is subject to conflict in the proof, which ranges from about $11,000 to about $14,900, the defendants withdrew from the agreement, permitted their contract in writing with the Virginian Joint Stock Land Bank for the purchase of the farms, which had been negotiated in the name of Colborn at the time that their agreement with Hardman was made, to be cancelled, and then caused the farms to be conveyed to the brother-in-law of the defendant Polino, a man by the name of Delsardo, who took possession, ousting Hardman. Plaintiff claims that this action on the part of the defendants breached his contract, and on that breach he brought his action in assumpsit in the circuit court of Randolph County alleging, in a special count that accompanied the common counts in his declaration, that "the said defendants undertook and agreed that they would enter into a contract with and purchase from said Virginian Joint Stock Land Bank Company the whole of the said lands and would organize a corporation under the laws of the State of West Virginia to be known as the Maple Springs Farms, Inc., and that said defendants would cause to be conveyed to said corporation all of said lands and said defendants further agreed that they would furnish all the necessary money and capital with which to purchase said lands from said Bank and to purchase the necessary equipment to properly equip said farms, also necessary and proper live stock *so as to develop said farms, to their highest effi-*

*ciency as farming lands,* and, while it was not definitely settled at the time of said agreement, the amount of the capital stock of the said corporation to be organized, yet the amount of $................ was tentatively agreed upon but it was agreed and understood between the plaintiff and the defendant that he, the said plaintiff, was to have issued to him one-third of all the capital stock of the said corporation without any expense to him and that all moneys advanced by the said defendants were to be charged against the said corporation and to be repaid to them out of the earnings of said corporation.''

A demurrer to the declaration, in seven points, was overruled. Upon submission of the case to a jury, a verdict for plaintiff in the sum of $18,739.66 resulted. From the judgment entered on this verdict, after defendants' motions were overruled, this writ of error is prosecuted.

The court below was right in overruling the demurrer to plaintiff's declaration. Without going in detail into the seven assigned grounds of the demurrer, it suffices to say that the negotiations between the parties to this suit partook of the nature of a promoters' agreement. They were interested in forming a corporation for certain purposes, to hold certain properties and to be the means of bringing about conditions contemplated by the agreements that they had among themselves. Such understandings are fiduciary in character and are enforceable. It is true that the corporation itself never acquired a direct legal right to insist upon having these farms conveyed to it from the Virginian Joint Stock Land Bank. But that right did, by virtue of the contract of the Virginian Joint Stock Land Bank with A. J. Colborn, come within the control of what may be regarded as the joint enterprise for the formation of the corporation. If the understanding was otherwise enforceable, Colborn took the contract for the benefit of himself, Polino and Hardman and for whatever purposes the three had in common. A trust for those persons and for those purposes attached to the land in his hands or to whatever contract he had, giving him a right to the conveyance of the land.

The consideration that carried Hardman into the joint enterprise, according to the allegations of the declaration, was the fact that he had pending with responsible persons nego-

tiations which would, if successful, have resulted in a transaction giving Hardman a substantial interest in the farms. These negotiations the defendants specifically requested him to drop, and this, it is alleged, he did. After this, he took up negotiations with the defendants at their request. We are of opinion that these allegations lay the basis of consideration. For the purpose of demurrer, we look, of course, exclusively to the declaration, but as a matter of fact the proof on consideration out-runs its allegations. It is shown that Hardman performed personal service for the benefit of himself and the defendants in the undertaking. He traveled to Charleston and to Pittsburgh. He gave, apparently in good faith, the full result of his previous negotiations with the Virginian Joint Stock Land Bank to the benefit of the joint undertaking. So that, having determined that the allegations on this question are sufficient, we find no difficulty in saying that, according to the proof, a sufficient consideration moved from Hardman to support a contract, if indeed a contract was made. Here we are confronted with the serious question in the case.

Bearing in mind the allegation of the declaration that defendants' promise to contribute enough money as a loan to the corporation to purchase and supply these farms, and "to develop said farms, to their highest efficiency as farming lands", we must turn to the proof for the purpose of ascertaining whether an enforceable contract under the allegations has been shown. The demurrer did not expressly raise the question of whether the contract itself, as alleged, is too uncertain to be enforceable.

Hardman's testimony is sufficiently clear on the definite things that he says the defendants undertook to do. The purchase of the farms, their stocking, meeting the machinery requirements, naming of himself as manager, and the setting apart to him of one-third of the capital stock of the corporation are all matters either sufficiently certain or capable of being made certain. The difficulty lies in arriving at the amount of money defendants were to contribute for these purposes and for the purpose of developing the farms and carrying them in the future. Counsel for the plaintiff in his brief attempts to say that Hardman's testimony can be taken to place a limit of $20,000 on this amount. Hardman, in his

own testimony, repudiates this theory. On page 322 of the printed record, upon re-direct examination, in response to a question by his own counsel, Hardman says: "There certainly was never any agreement to that effect—no limit as to the amount of money that these gentlemen would put up into financing it—I might have said we might get through with fifteen or twenty thousand dollars—with proper management—and take care of those payments extending over twenty years, but Mr. Polino always said to me—over and over and over again—'Get whatever you need—I will finance it—and get the best of everything'—and I, under my management and Mr. Hart's, were trying to keep it down." At page 67 of the printed record, on cross-examination, Hardman stated as follows: "Alright—I won't answer it 'yes' or 'no'—I will have to tell the truth about it—I don't recall fixing a figure except we agreed *perhaps* between fifteen and twenty thousand dollars would be sufficient, but I never told them just how much it would take to finance it—because I didn't know—but I always told them it depended on the way it was managed and the way the money was spent." On the same page of the printed record, he also stated: "My answer is that I don't recall of ever telling them how much money it would take to finance it—*that would be looking too far into the future.*" Counsel for plaintiff at page 135 of the printed record, in stating the theory upon which plaintiff was presenting his case, said: "* * * but I contend that the measure of damages in this case under the contract is—what are those lands worth in a corporation sufficiently financed to buy them and operate them—that is the point here." No limit is placed on the financing. That the case proceeded upon this theory is further exemplified by many of the questions propounded to the witnesses for the plaintiff. At page 54 of the printed record, the following fair example of some of these questions is found: "Mr. Hardman, as to the approximately 400 acres of land—had the title vested in a corporation sufficiently financed to purchase the land and to operate the farm lands, what was the value of that farm at the time you say you were kicked out—that seems to be the best expression in regard to the contract?" Turning to plaintiff's instructions, we find further evidence that the case developed upon this theory of an undertaking on the part of the

defendants to supply money to develop the farms without limit. Plaintiff's instruction No. 1 told the jury, among other things, that if they found "the defendants agreed to organize a corporation and vest the title of said land in the corporation and further agree to finance said corporation in the purchase of said lands and the development thereof", without placing a limit upon the contributions, that plaintiff is entitled to recover damages, etc.

Is a contract to make advancements unlimited both as to time and amount valid? On this question, we find the following illustrative cases:

In *Erwin & Williams* v. *Erwin*, 25 Ala. 236, plaintiffs declared upon a contract providing in part that "he, the defendant, would assist the plaintiffs, by endorsing their paper, and advancing them money, to enable them to carry on the mercantile business advantageously." There were additional counts to the declaration substantially along the same line. The court's opinion upon decision of the case said: "But we prefer resting our opinion upon the fact, that, conceding this to be a contract, it is so indefinite and uncertain as to be wholly void. The defendant was to endorse the plaintiffs' paper, and to make advancements. When, and for how much, was he to endorse, and how often? How long should the obligation to endorse rest upon him? How much money was he to advance, and when, and on what securities, were the advances to be made? The contract is silent as to all these matters. If it be answered, that he was to advance enough to enable them to carry on their mercantile business, this does not aid the matter; for the question recurs, upon what scale is it to be carried on? The capital must bear some just proportion to the nature and size of the business to be carried on, and this is left wholly unsettled. It is clear, then, that no breach could be assigned upon it, which could be compensated by any criterion of damages to be furnished by the contract itself, and it is void for uncertainty.—See *Moore* v. *Smith*, 19 Ala. Reports 774, 783; 1 Chitty Pl. 261, 232, 236-7; Chitty on Contracts, 72; *Figs* v. *Cutler*, 3 Stark R. 139; *Sherman* v. *Kitzmiller*, 17 Serg. & R. 45."

In *United Press* v. *New York Press Co.*, 58 N. E. 527, in the New York Court of Appeals, reported in 53 L. R. A., at page

288, plaintiff sued on a contract providing, among other things, "to pay to the first party therefor a sum not exceeding $300.00 during each and every week that said news report is received by the second party until the first day of January, in the year 1900, it being understood and agreed that said news reports continue to be fully equal in quality and quantity to its present average standard." In commenting upon the indefiniteness of this contract, the court, in its opinion said: "It lacks support in one of its essential elements,—in the absence of a statement of the price to be paid. That was a defect which was radical in its nature, and which was beyond the reach of oral evidence to supply; for, if the intention of the parties, in so essential a particular, cannot be ascertained from the instrument, neither the court nor the jury will be allowed to make any agreement for them upon the subject. It is elementary in the law that, for the validity of a contract, the promise or the agreement of the parties to it must be certain and explicit, and that their full intention may be ascertained to a reasonable degree of certainty. Their agreement must be neither vague nor indefinite, and, if thus defective, parol proof cannot be resorted to. 1 Comyn. on Contracts, 3; 1 Chitty on Contracts, 92; *Elmore* v. *Kingscote,* 5 Barn. & C. 583; *Blagden* v. *Bradbear,* 12 Ves. Jr., 468; *Williams* v. *Morris,* 95 U. S. 456, 24 L. Ed. 360; *Parkhurst* v. *Van Cortlandt,* 1 Johns. Ch. 273; *Stone* v. *Browning,* 68 N. Y. 598-604."

In *Van Schaick* v. *Van Buren,* 70 Hun. 575, 24 N. Y. S. 306, plaintiff sued for breach of an agreement made by defendant that defendant would loan him the sum of $1500 for one year represented by his note with certain indorsements and that at the end of the year he would advance to him a further sum of $1500 and accept a first mortgage on a certain farm to secure the aggregate of $3,000 thus advanced, the loan to run "for a term of years": Held, the agreement was too uncertain to be enforceable and that consequently damages would not lie for its breach.

In *Flaherty* v. *Cary,* 70 N. Y. Supp. 951, the defendants, a firm of attorneys, had agreed to assist plaintiff in organizing a mortgage insurance company, and to accept as stockholders only those who would consent that plaintiff should be employed as general agent of the corporation when formed, at a

fixed salary, and should have full control of the solicitation of insurance and the employment of subagents for that purpose. The contract was to continue during the life of the corporation, unless terminated by either party on six months' notice, on certain conditions. The appellate division of the New York Supreme Court, in an opinion holding the contract unenforceable on account of its uncertainty, said: ''Nothing is stated as to the amount of capital stock, the number of directors, the scope of the operations of the company, or as to the form or manner in which the assent of the stockholders to the plaintiff's employment upon these conditions was to be secured. The terms and conditions of the employment of defendants as counsel for the corporation were never agreed upon. We find no cases exactly in point, but there are many cases where contracts more definite have been declared unenforceable either in an action at law or a suit in equity. *United Press* v. *New York Press Co.*, 164 N. Y. 406, 58 N. E. 527; *Sourwine* v. *Truscott*, 17 Hun. 432; *Van Schaick* v. *Van Buren*, 70 Hun. 575, 24 N. Y. Supp. 306; *Milliman* v. *Huntington*, 68 Hun. 258, 22 N. Y. Supp. 997; *Bennett* v. *Egan*, 3 Misc. 421, 23 N. Y. Supp. 154; *Snow* v. *Fertilizer Co.*, 58 Hun. 134, 11 N. Y. Supp. 492; *Davie* v. *Mining Co.*, 93 Mich. 491, 53 N. W. 625, 24 L. R. A. 357; *Sherman* v. *Kitzmiller*, 17 Serg. & R. 45; *Marble* v. *Oil Co.*, 169 Mass. 553, 48 N. E. 783.''

In *Jones* v. *Vance Shoe Co.*, in the Circuit Court of Appeals for the Seventh Circuit, reported in 115 Fed., page 707, two stockholders of a corporation had entered into an agreement providing: ''The said party of the first part hereby agrees to pay into the treasury of the said Smith & Jones Company, the sum of $20,000.00 cash, and to guarantee, in lieu of the present guarantee of J. P. Smith, the notes of the Smith & Jones Company now held by the Continental National Bank of Chicago, to the amount of $25,000.00, and to provide, as a loan to the said Smith & Jones Company, whatever additional capital is needed to provide for a working fund.'' A demurrer to a declaration based upon this contract was sustained in the district court, and, upon appeal, the Circuit Court of Appeals said in the syllabus: ''A written contract between two stockholders in a corporation, by which one agreed, 'to provide as a loan to the said (corporation) what-

ever additional capital is needed to provide a working fund,' is too uncertain and vague to be enforceable in a court of law by an action to recover damages for its breach."

In order to take his case out of the rule indicated by the foregoing quotations, and by many other cases based upon facts not so directly related to the facts here, which might be quoted, the plaintiff relies upon the case of *McCullough* v. *Clark,* the opinion on the first writ of error of which is reported in 81 W. Va. 743, 95 S. E. 787, and on the second writ of error in 88 W. Va. 22, 106 S. E. 61. We believe that that case is materially to be distinguished from the case at bar. There the plaintiff had contracted with the defendant for the purchase of corporate stock at a named price. The measure of damages was the difference between the price named and the true worth of the stock. In order to arrive at the worth of the stock, plaintiff was permitted to show the extent and value of the corporate assets. Among these was an unexecuted contract to cut timber and also the corporation's equity in lands, the legal title to which was vested in the defendant. But where the facts here make their abrupt departure from the facts in the *McCullough* case, is at the point that plaintiff proceeds upon the additional theory of lands vested in a corporation sufficiently financed to hold and develop them or to develop them to their highest efficiency as farming lands. The fatal uncertainty of the contract here does not consist in the fact that the value of the stock plaintiff contends he was entitled to receive must be arrived at by valuing the assets in the hands of the corporation. If the question were that of definite assets in the hands of the corporation at a certain time, then that value could be made satisfactorily sure by proof before the jury. That is not the case here. The contract itself is uncertain in that, according to its terms, the value of the corporate assets rests upon a contingency not definitely expressed.

We are therefore of the opinion that the case made out on the theory of plaintiff's second count, his proof and his instructions, discloses a contract not of sufficient certainty to be enforceable and that for that reason the judgment of the court below must be reversed, the verdict of the jury set aside, and the defendants awarded a new trial.

414

We do not attempt to decide the rights of the plaintiff other than upon his express contract. Under the theory upon which his case was tried, although the common counts were included in his declaration, we do not feel called upon in this opinion to decide what his rights may or may not be upon the quantum meruit for services performed, or otherwise.

There are in the printed record and in the brief of the plaintiff in error, many other assignments of error and many other points raised. Owing to the fact that the case is decided upon the first question met and the most fundamental question involved in this writ of error, we do not feel called upon to deal in detail with these other assignments. It is sufficient to say that in the relation they bear to the questions herein discussed, we consider them satisfactorily disposed of.

*Reversed; verdict set aside; new trial awarded.*