## LOCAL DIVISION 589, AMALGAMATED TRANSIT UNION, AFL–CIO, et al., Plaintiffs,

### v.

## The COMMONWEALTH OF MASSACHUSETTS, et al., Defendants.

### Civ. A. No. 79–2058–S.

United States District Court, D. Massachusetts.

March 17, 1981.

---

**314**

Harold B. Roitman, Segal, Roitman & Coleman, Boston, Mass., I. J. Gromfine, Douglas Taylor, Gromfine & Sternstein, Washington, D. C., Linda Hirshman, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., William J. Riley, Boston, Mass., for plaintiffs.

Joseph H. Elcock, Gen. Counsel, M.B.T.A., Dwight Golann, Asst. Atty. Gen., Boston, Mass., for defendants.

## MEMORANDUM AND ORDER ON MOTIONS FOR PRELIMINARY INJUNCTIONS

SKINNER, District Judge.

I. *STATEMENT OF THE CASE AND PRELIMINARY FINDINGS OF FACT*

In this action the plaintiff, Local Division 589, Amalgamated Transit Union ("Transit Union") seeks declaratory and injunctive relief against the Massachusetts Bay Transportation Authority ("MBTA") and its Chairman of the Board, and also against the Commonwealth of Massachusetts in the following respects:

 a. A declaration that chapter 405 of the Massachusetts Acts of 1978 (M.G.L. c.161A §§ 19 and 19C–G) (hereinafter "c.405") is not effective to alter the procedure for interest arbitration[1] contained in the Transit Union's collective bargaining agreement.

 b. A mandatory injunction requiring the MBTA to proceed immediately to interest arbitration in accordance with the Transit Union's collective bargaining agreement.

 c. A declaration that chapter 581 of the Massachusetts Acts of 1980 (hereinafter "c.581") purporting to prohibit the MBTA from entering into collective bargaining on a number of particular issues is invalid.

 d. An injunction prohibiting the laying off of approximately 500 members of the Transit Union which is scheduled to become effective on Saturday, March 21, 1981.

Boston Lodge 264 of District 38, International Association of Machinists and Aerospace Workers (hereinafter "Machinists' Union") has been allowed to intervene on behalf of machinists employed by the MBTA, 58 of whom are scheduled to be laid off on March 21. The Massachusetts Bay Transportation Authority Advisory Board (hereinafter "Advisory Board") has appeared and argued in opposition to the positions of the plaintiff and the intervenor. The Machinists' Union takes the same position as the Transit Union, except that with respect to lay offs it asserts protection under its contract which the Transit Union does not claim. It also seeks arbitration with respect to the lay off of its 53 members.

The claims of the two unions are asserted under section 13(c) of the Urban Mass Transportation Act of 1964 ("UMTA"), 49 U.S.C. § 1609(c), the "13(c) agreement" executed by the MBTA in 1974 and the contract clause of the United States Constitution, Art. I, section 10.

In July of 1980 the Transit Union initiated collective bargaining under the then-current provisions of its collective bargaining contract. Negotiations continued until the end of September 1980 without success. As provided in the collective bargaining agreement the parties then proceeded to interest

---

1. "Interest arbitration" is arbitration over the terms of proposed collective bargaining agreement, as opposed to "grievance arbitration", which is arbitration of specific disputes under the terms of an existing agreement.

arbitration in the manner specified in the agreement. Thereafter the MBTA refused to participate in the selection of the third arbitrator and asserted that it was without authority to arbitrate except in accordance with c.405 of the Acts of 1978. The matter was referred to the Secretary of Labor, who apparently took the position that the contract procedure was in force by reason of section 13(c). There was apparently some further backing and filling, but as of November the parties were at a stand-off: the MBTA was willing to arbitrate only in accordance with c.405 and the unions were willing to arbitrate only in accordance with the collective bargaining agreement.

In November of 1978, the MBTA ran over its budget. The Governor exercised purported emergency powers to keep it running. In the course of the legal and legislative flurry that followed, the legislature enacted c.581 of the Acts of 1980. The Advisory Committee thereafter approved a budget for 1981 for the MBTA which was $7 million less than that for the previous year. The MBTA has scheduled cuts in service and the lay offs above referred to purportedly in an effort to reduce its expenses to the budgeted level.

## II. JURISDICTION

Argument as to jurisdiction is foreclosed by the decision of the Court of Appeals in Local Div. No. 714, etc. v. Greater Portland, etc., 589 F.2d 1 (1st Cir. 1978), as is argument as to the existence of a claim upon which relief can be granted. In that case it was held that the union had the right to enforce the terms of section 13(c) of UMTA, which meant in effect the terms of the agreement entered into in compliance with that statute. The Court recognized that by reason of the authority delegated to the Secretary of Labor the agreement might well impose requirements on a transit authority broader than the minimum requirements specified in the statute. Accordingly, the terms of the agreement are the

primary source of rights and liabilities, to which the statute and its legislative history provide only the most general guide.

## III. ABSTENTION

The defendants and the Advisory Board all urge this court to abstain because of the pendency in the state courts of several actions relating to some of the same subjects. One of these cases is MBTA v. Adams, in the Supreme Judicial Court for Suffolk County, No. 79–388 Civil. That case was removed to this court but was remanded for lack of removal jurisdiction because the plaintiff could not have originated the case in this court. (Memorandum and Order, C.A. 79–2059–S). MBTA v. Adams is an action to set aside an "award" of an arbitrator which consists of a legal ruling that c.405 is invalid and ineffective to alter the arbitration procedures contained in the collective bargaining agreement. MBTA v. Adams could be resolved in terms of the arbitrator's authority with consideration of the underlying federal questions. The second case is Local 589, etc. et al. v. MBTA, Suffolk Superior Court, C.A. No. 45919. That case has so far been concerned with the parties' rights under the extension period of the collective bargaining agreement in the light of c.581 of the Acts of 1980, although the complaint contains a reference to the contract clause of the Constitution, Art. I, section 10. The case has not been concerned with the effect of section 13(c) of UMTA or the 13(c) agreement.

Where the jurisdiction of the court has properly been invoked, this court is obliged to act in the absence of compelling reasons of comity and practicality. While state law does underlie the resolution of this case, as far as I can determine there are not any significant questions concerning state law at issue in the state cases, the resolution of which will aid in the decision of this case.[2] In these circumstances abstention is. at best a discretionary matter. Puerto Rico International Airlines, Inc. v.

---

2. None of the parties disagree about the meaning of the state statutes involved; they disagree about the effect of those statutes on existing contracts and their interrelation with federal law.

**316**

*Silva Recio*, 520 F.2d 1342, 1345 (1st Cir. 1975). One of the issues to be considered in the exercise of discretion is the exigency of the issue to be decided. It is clear that significant arbitration necessary to resolve the current labor dispute affecting this critical transit system will not proceed until the federal questions are resolved. This does not strike me as the time for an elegant game of jurisdictional shuttlecock. *Cf. England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed. 440 (1964). Accordingly, I shall proceed with an attempt to resolve the federal questions.

## IV. THE COLLECTIVE–BARGAINING AGREEMENT

Section 13(c) of UMTA and the agreement thereunder are essentially preservative rather than creative of contract rights, as is the contract clause of the Constitution. A useful first inquiry is to determine whether the collective bargaining agreements pre-date the 1974 13(c) agreement or post-date it; similarly, whether they pre-date c.405 or post-date it. All agree that they pre-date c.581 of the Acts of 1980.

The defendants contend that the Transit Union's current collective bargaining agreement is dated August 8, 1979, and the Memorandum of Understanding, dated August 8, 1979, merely incorporated by reference all of the unamended provisions of the Articles of Agreement of January 1, 1973.

They argue further that the notification of desire for change under Section 600 terminates the contract, since there is no other explicit provision for termination.

If the notification of a desire for change provides only for amendment, then it would superficially appear, as defendants say, that the contract rolls on in perpetuity. Massachusetts law, however, provides for termination of such contracts by operation of law, in some cases on appropriate notice. *Simons v. American Dry Ginger Ale Co., Inc.*, 335 Mass. 521, 524, 140 N.E.2d 649 (1957); *Phoenix Spring Beverage Co. v. Harvard Brewing Co.*, 312 Mass. 501, 506, 45 N.E.2d 473 (1942); *Marble v. Standard Oil Co.*, 169 Mass. 553, 561, 48 N.E. 783 (1897). I need not consider what would be necessary to terminate the agreement in this case, because neither party has made any attempt to do so.

The Memorandum of Understanding by its explicit terms provides:

1. That the Articles of Agreement entered into as of January 1, 1973, as amended, shall be further amended as follows:

\* \* \* \* \* \*

Section 600 of the Articles provides that it shall continue in force "until and including the thirty-first day of December, 1975, and from year to year thereafter unless changed by the Parties hereto." Section 601 provides for arbitration in the event of a disagreement with respect to requested changes, "and the Award shall then be entered into and *become a part of this Agreement.* [Emphasis supplied.] I take the Memorandum of Understanding as an authentic interpretation and resolution by the parties of the inconsistent provisions of Sections 600 and 601.

I conclude from the foregoing that the Transit Union's current collective bargaining agreement is embodied in the Articles of Agreement dated January 1, 1973, as most recently amended August 8, 1979.

The defendants contend further that the Machinists' Union has no current collective bargaining agreement at all, and has not had one since December 31, 1977. Their most recent contract is dated January 1, 1976 to continue until December 31, 1977 and from year to year thereafter unless notice of a desire to change or terminate the contract is served by one party on the other at least 60 days before the next anniversary. A notice to change was so served by both parties in October of 1977. By the terms of the contract, this notice operated to cut off the "year to year" extended term. In fact, however, as appears from the uncontradicted affidavit of Anthony Mastandrea, the parties have treated the agreement as continuing in force up to this time, and have mutually enforced its terms as

from time to time amended. I rule that the MBTA is estopped to deny the continuation in force of the agreement dated January 1, 1976, which is the Machinists' Union's current collective bargaining agreement with MBTA.

Accordingly, both collective bargaining agreements pre-date c.405 of the Acts of 1978.

## V. THE EFFECT OF c.405 OF THE ACTS OF 1978 ON CONTRACT PROVISIONS FOR ARBITRATION—THE CONSTITUTIONAL QUESTION

█ The next question concerns the power of the state to alter the existing contractual arrangements of its public corporations. It was early recognized that the contract clause imposes less of a restriction on a state's impairment of the rights of those who deal with public corporations than an impairment of the rights of other contracting parties. It was thought that the state had a compelling interest in the governance of such corporations which outweighed the sanctity of contracts. *Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 628, 4 L.Ed. 629 (1819). More recently, the state's rights have been perceived as subject to constitutional limitation, even when the contracting party is a public body. This limitation is illustrated by two relatively recent cases: *City of El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965), and *United States Trust Company of New York, Trustee v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). In summary, a state may impair an obligation of a public body only with respect to some aspect of the contract which was not central to the reasonable expectations of the contracting parties, and then only if the impairment is reasonable and necessary in the furtherance of a valid state policy.

Plaintiffs point to an arbitration "award" now being contested in the Supreme Judicial Court of Massachusetts, in which the arbitrator ruled that c.405 was invalid. The cases cited by the plaintiff to establish collateral estoppel by this award all deal with grievance arbitration. I know of no case in which the judgment of an arbitrator (who may not be a lawyer) is held to bar resolution of a pure question of law by a court of competent jurisdiction.

█ I rule that c.405 of the Acts of 1978 was effective to amend and add to the agreement of the parties relative to interest arbitration except with respect to the central mutual consideration of the agreement and the core of the parties' reasonable expectations. The detailed application of this principle to the agreement in question follows:

a. I rule that tripartite arbitration, as provided in the agreements, whereby each side chooses its own arbitrator and those arbitrators choose a neutral third, is a central consideration of the contracts and cannot be disturbed by subsequent legislation. So much of c.405 as imposes arbitration by a single arbitrator is invalid.

b. The qualifications of the neutral arbitrator are not stated in the agreements except that he is to be "experienced in transportation". This clearly is not intended to be exclusive. The additional qualifications imposed by c.405 that the neutral arbitrator be a legal resident of the commonwealth and experienced in state and local finance is not in conflict with nor an impairment of the contract, and is a reasonable and valid provision.

c. The agreements do not specify the standards which shall be applied by the arbitrators. Accordingly, there is no conflict or impairment in the provision of c.405 (appearing as M.G.L. c.161A § 19F) requiring the arbitrators to rely "primarily" on eight factors in determining an award. The factors are not exclusive, and, moreover, number 8 includes such factors "normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining [etc.] ... in the public service of the commonwealth."

d. The limitation on awarding a provision for cost-of-living adjustments after the period covered by the award is a limitation on the prior power of the arbitrators, but I find and rule the same to be within the power of a state to control the affairs of a public corporation.

There are, moreover, two provisions of c.405 which grant to the arbitrators power which they did not have before, to which apparently the plaintiffs do not object. The first is to inquire into the financial capacity of the Authority. The arbitrators are not limited to the specific considerations of tax burdens under this provision, but under the generality of the paragraph can presumably inquire as to other opportunities for savings or for the raising of fares. The second is that the award of the arbitrator may be enforced against the appropriate legislative or appropriating body.[3] M.G.L. c.161A § 19G. Cf. City of Boston v. MBTA, 373 Mass. 819, 370 N.E.2d 1359 (1977).

In summary, absent the provisions of section 13(c) of UMTA and the 13(c) agreement of 1974, binding interest arbitration must be conducted in accordance with c.405 of the Acts of 1978 except that three arbitrators shall be chosen as provided in the collective bargaining agreements and the third or neutral arbitrator shall be (1) experienced in transportation, (2) a legal resident of the Commonwealth of Massachusetts, and (3) experienced in state and local finances.

## VI. THE EFFECT OF c.581 OF THE ACTS OF 1980 ON THE CONTRACT PROVISIONS—THE CONSTITUTIONAL QUESTION

The same legal criteria apply to this question as are set out at length in the foregoing section. There is no doubt in my mind that the obligation to continue to bargain collectively is a central consideration of the agreements in force when c.581 of the Acts of 1980 was passed. To the extent that c.581 withdraws questions of substance from collective bargaining it is in violation of Article 1, section 10 of the Constitution of the United States. Counsel for the Advisory Board suggests that I consider the practical consequences of my rulings, and I agree that I should where there are areas of discretion or open interpretation. Clear legal and constitutional mandates may not be avoided, however, even if they result in the practical disaster which he foresees. The MBTA's arguable lack of success in collective bargaining does not justify repudiation of its contractual agreements, which were fully authorized by the legislature. M.G.L. c.161A § 19.

## VII. THE EFFECT ON THE FOREGOING OF SECTION 13(c) OF UMTA AND THE 13(c) AGREEMENT ENTERED THEREUNDER

As previously stated, under the Court of Appeals' decision in Local Div. No. 714, etc. v. Greater Portland, etc., 589 F.2d 1 (1st Cir. 1978), enforcement of rights under section 13(c) means enforcement of the terms of the contract entered into in pursuance thereof. The parties agree that the provision of that contract which bears on this controversy is paragraph 4, the material part of which is as follows:

4. The collective bargaining rights of employees of the Authority represented by Labor Organizations signatory hereto [4] including the right to arbitrate labor disputes and to maintain union security and check-off arrangements, to the extent such are provided for by applicable laws and/or existing collective bargaining agreements, or otherwise shall be preserved and continued.

While such a provision might have broad application in a variety of situations, particularly where a public authority has used UMTA funds to acquire a private transit system, I shall confine my discussion to its effect in the present case. The first inquiry is to settle the meaning of "and/or" in the phrase "provided for by applicable laws

---

3. Presumably the Advisory Board and its constituent cities and towns.

4. The plaintiff and the intervenor unions were such signatories.

and/or existing collective bargaining agreements", since in this case there are both applicable laws and an existing collective bargaining agreement, at least with respect to the Transit Union. While the words and symbol "and/or" are anathema to the purist, "they are continued in use and Courts will have to deal with them according to the facts appearing in any particular case." *McPherrin v. Hartford Fire Ins. Co.*, 44 F.Supp. 674, 676 (N.D.Cal., 1942). The practical construction of the phrase is to treat the phrase as if the alternatives were listed with either conjunction and followed by the phrase "or any combination thereof". 17 Am.Jur.2d, *Contracts,* § 283.

The contract speaks of "existing collective bargaining agreements" and "applicable law." The existing collective bargaining agreement for the Transit Union at the time of this contract were the Articles of Agreement of January 1, 1973. The record is silent as to the then-existing agreement of the Machinists' Union. The word "existing" is conspicuously not modifying applicable law. The continuation of the various employee benefits listed in the agreement is to continue, in my opinion, as provided in the collective bargaining agreement in force in 1974 subject to such laws as are "applicable" from time to time. Chapter 405 is applicable in part, as outlined above, but not applicable with respect to the termination of tripartite arbitration. Chapter 581 is not applicable, because it conflicts with the essential provisions of a prior agreement, and its applicability is interdicted by Article 1, Section 10, of the United States Constitution.

In short, the rights of the parties established by the interrelation of existing collective bargaining agreements, state statutes and the contract clause of the Constitution have been preserved but not altered by the 13(c) agreement. These rights remain as stated in Sections IV, V and VI of this memorandum. All that section 13(c) has accomplished in the context of this case is to provide a federal forum for the enforcement of these rights.

## VIII. *ENJOINING THE LAYOFF—THE MACHINISTS' UNION*

 The collective bargaining agreement of the Machinists' Union dated January 1, 1976 remains in force. It contains a flat prohibition against layoffs in Article XIV:

A. No Layoff—No employee, in any classification under the jurisdiction of the Association, shall be laid off during the term of this Agreement.

Despite the flat, unequivocal language of Article XIV, there remains a necessary residual, inherent right of the MBTA to lay-off employees when it runs out of money. Its collective bargaining contract does empower it to demand funds in excess of its budget (unless it is necessary to fund an award made under c.405 of the Acts of 1978, M.G.L. c.161A § 19G). The propriety of such layoffs is clearly a controversy subject to binding arbitration under the terms of Article XLI of the collective bargaining agreement. This is not "interest arbitration" and consequently is not subject to the c.405 of the Acts of 1978 in any respect.

## IX. *ENJOINING THE LAYOFF—THE TRANSIT UNION*

 The "no layoff" provision, Section 124 of the Transit Union's agreement, as amended August 8, 1979, contains the following provisions:

Notwithstanding the provisions of Section 106 hereof, no employee in any classification under the jurisdiction of the Union will be laid off up to and including December 31, 1980 . . . . [provisions about temporary employees].

For non-miscellaneous employees hired after the date of this Agreement, the No Layoff provision shall not apply during the first thirty (30) months of service.

The members of the Transit Union are in a more perilous situation than the members of the Machinists' Union. Section 124, as amended, provides no job security whatsoever for "non-miscellaneous" (*i. e.*, classified) employees hired after August 8, 1979 during their first 30 months of service. Thirty months have not yet elapsed. These employees constitute a large proportion of

those scheduled for layoff on March 21, 1981. They had no contract right to job security, and in view of their contract, no reasonable expectation of job security until 30 months elapsed. Even given the broadest theory of the discretionary power of the court to preserve the status quo, I do not see how a court would have any basis for enjoining the layoff of these employees.[5]

As to the employees hired prior to August 8, 1978, their job security expired on December 31, 1980. Plaintiffs suggest that some generalized obligation of fairness under section 13(c) of UMTA prevents the MBTA from utilizing the breakdown of collective bargaining and the resulting extended hiatus in employment security to accomplish the proposed layoffs. The contract provision was negotiated between the parties, and I perceive no legal or equitable basis for relieving the Union of a tough bargain any more than I see a basis for relieving the MBTA of a number of tough contract provisions upon which the Unions insist.

There is precedent in labor law, however, for maintaining the status quo during arbitration, including interest arbitration. *Local Division 519, Amalgamated Transit Union v. Lacrosse*, 445 F.Supp. 798 (W.D. Wisc.1977), aff'd, 585 F.2d 1340, 1350–51 (7th Cir. 1978); *Teamsters Local Union 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1342 (4th Cir. 1978), cert. denied, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Division 1447, Amalgamated Transit Union v. Louisville and Jefferson County Transit Authority*, No. C 79–0629 L(A) (W.D.Ky. 1980); *Division 1309, Amalgamated Transit Union v. San Diego Transit Corp.*, Civ. No. 78–1093–E (S.D.Cal.1979). If there were arbitration underway, and there were some likelihood that a resolution of the controversy would occur with reasonable dispatch, the public interest might well be best served by a preliminary injunction. The layoffs and the resulting curtailment of services have been ordered unilaterally by

the MBTA with minimal opportunity for consideration of other ways of reducing MBTA expenses to comply with the Advisory Board's budget.

If I were advised before March 21, 1981 that arbitration between the MBTA and the Transit Union had commenced in accordance with this memorandum, I would consider enjoining the layoff of employees hired prior to August 8, 1979, but not otherwise. Accordingly, no injunction will issue at this time.

## X. SUMMARY

In accordance with the foregoing, I am of the opinion that the plaintiffs are likely to succeed on the merits in establishing the following:

a. The MBTA and the Transit Union are obliged forthwith to institute interest arbitration by three arbitrators chosen in accordance with the Articles of Agreement dated January 1, 1973, but otherwise subject to the qualifications and considerations contained in c.405 of the Acts of 1978.

b. Chapter 581 of the Acts of 1980 is invalid to restrict the scope of collective bargaining contained in the unions' existing collective bargaining agreement, because said chapter constituted an impairment of contract in violation of Article 1, Section 10, of the Constitution of the United States.

c. The proposed layoffs of members of the Machinists' Union is in direct violation of the explicit terms of the collective bargaining agreement, and while they may be justified they are properly the subject of arbitration under the existing agreement before they are effectuated. Such arbitration would not be interest arbitration subject to c.405 of the Acts of 1978.

The plaintiffs are not in my opinion likely to succeed on the merits in establishing any basis for enjoining the proposed layoff of Transit Union employees, except that they

---

**5.** A possible exception would be a deliberate discriminatory animus in the selection of these employees aimed at causing the brunt of lay-

offs to fall on recently hired racial minorities. There is nothing in the record so far which would support any such conclusion.

might likely succeed with respect to employees hired prior to August 8, 1979 in establishing a basis for an injunction for a reasonable time pending arbitration, as described in paragraph 1 above, providing that such arbitration is set in motion prior to March 21, 1981.

In addition to the likelihood of success on the merits, I am obliged to consider the likelihood of irreparable harm to the plaintiffs if injunctive relief is not granted. Such irreparable harm must be weighed against the harm to the defendants resulting from the issuance of a preliminary injunction. In a case involving a public facility, the public interest must be considered.[6] *Levesque v. Maine*, 587 F.2d 78, 80 (1st Cir. 1978).

Weighing these factors, I am satisfied that a continued hiatus in the collective bargaining and arbitration process puts the continuing operation in such jeopardy as to create a serious likelihood of irreparable harm to the plaintiffs and, more critically,

to the public. The discharge of members of the Machinists' Union in violation of their contract, without the opportunity for arbitration, presents a likelihood of irreparable harm to the employees and to the public because of the resulting deterioration of service.

Accordingly, preliminary injunctions will issue:

(1) Ordering the MBTA and the Transit Union to proceed forthwith to interest arbitration in accordance with the foregoing memorandum;

(2) Ordering the MBTA and the Machinists' Union to proceed forthwith to arbitration concerning the proposed layoff of 53 members and enjoining such layoff for a reasonable time pending the prompt completion of arbitration.

Pertinent statutes and contracts not quoted are set out in the appendix hereto.

## APPENDIX

**161A § 19** **CORPORATIONS**

**§ 19. Employees; collective bargaining; arbitration; applicable provisions**

The directors shall have authority to bargain collectively with labor organizations representing employees of the authority and to enter into agreements, with such organizations relative to wages, salaries, hours, working conditions, health benefits, pensions and retirement allowances of such employees: provided, however, that the directors shall have no authority to bargain collectively and shall have no authority to enter into collective bargaining agreements with respect to matters of inherent management right which shall include the right:

(*i*) to direct, appoint, employ, assign and promote officers, agents and employees and to determine the standards therefor.

(*ii*) (A) to discharge and terminate employees subject to the provisions of such clauses (B) and (C).

(B) No action set forth in (A) shall be sustained if, in a proceeding invoked in accordance with the provisions of such clause (C), the employee shall establish by a preponderance of the evidence that it was based upon race, color, religion, sex, age, national origin, handicapping condition, marital status, or political affiliation or activities or union activities or union organizing of the employees; a reprisal against the employee for disclosure of information by an employee which the employee reasonably believes evidences a violation of any law, rule or regulation or mismanagement, a gross waste of funds, or abuse of authority; a reprisal against any employee for the refusal of any person to engage in political activity.

(C) The parties may include in any written agreement a grievance procedure culminating in final and binding arbitration which may be invoked in the event any employee of the authority is aggrieved by any action taken under such clause (A).

**6.** It should be emphasized that the judgments arrived at in this case do not in any way reflect the court's judgment as to the best way to resolve the problems of the MBTA and its employees. As I indicated at the hearing, in my view, the insistence by the parties on their legal rights may ultimately lead to the demise or receivership of the system. My task, however, is to identify what these rights are and enforce them as requested in accordance with settled principles of law.

(*iii*) to plan and determine the levels of service provided by the authority.

(*iv*) to direct, supervise, control, and evaluate the departments, units, and programs of the authority; to classify the various positions of the authority and ascribe duties and standards of productivity therefor.

(*v*) to develop and determine levels of staffing and training.

(*vi*) to determine whether goods or services should be made, leased, contracted for, or purchased on either a temporary or permanent basis.

(*vii*) to assign and apportion overtime.

(*viii*) to hire part-time employees.

The authority is hereby prohibited from bargaining collectively or entering into any agreement to make pension benefit payments to its employees that are determined in a manner that includes the amount of overtime earnings of said employees.

The authority is hereby prohibited from bargaining collectively or entering into a contract which provides for automatic cost-of-living salary adjustments which are based on changes in the Consumer Price Index or other similar adjustments unless specifically authorized by law. Except as provided in sections nineteen C to nineteen G, inclusive, the employees of the authority shall submit all grievances and disputes pursuant to arbitration provisions in agreement existing at the time of the creation of the authority or subsequently entered into with the authority or, in the absence of such provisions, to the state board of conciliation and arbitration, or other board or body having similar powers and duties. The provisions of general or special laws relative to rates of wages, hours of employment and working conditions of public employees, shall not apply to the authority nor to the employees thereof, but the authority and its employees shall be governed with respect to hours of employment, rates of wages, salaries, hours, working conditions, health benefits, pensions and retirement allowances of its employees by the laws relating to street railway companies.

Amended by St.1977, c. 970, § 2; St.1978, c. 405, § 1; St.1980, c. 581, § 10.

## 161A § 19A BAY TRANSPORTATION AUTHORITY

### § 19A. State labor relations law; applicability

Notwithstanding any provisions of law to the contrary, the provisions of section five of chapter one hundred and fifty A shall so far as apt apply to the authority and its employees, excepting directors, executives and those confidential employees representing the authority and dealing with employee organizations. Nothing in this section shall be construed as conferring upon the employees of the authority the right to strike, nor as detracting from the obligations of the authority and the employees to submit all grievances and other disputes to arbitration.

Added by St.1970, c. 514.

#### Historical Note

St.1970, c. 514, an emergency act, was approved July 8, 1970.

### § 19B. Deceased employees; payment of wages or vacation allowances to nominated beneficiary, surviving spouse or next of kin

Whenever any employee or former employee of the authority dies, and the authority owes his estate any sum or sums by reason of services rendered by him for wages or vacation allowances, and neither a duly appointed executor or administrator nor a voluntary administrator has made written demand for payment upon the treasurer of the authority and such treasurer shall not otherwise have actual

notice that proceedings relative to the formal or informal settlement of such estate have been commenced in any probate court, such sum or sums may, in the discretion of the authority, be paid after the expiration of thirty days from the death of such employee to such person as may have been nominated as beneficiary, on a form approved by the directors and filed with the treasurer by such employee during his lifetime or, if there is no such beneficiary, then to the surviving spouse or next of kin of such employee. Payments made as provided in this section shall discharge all liability of the authority to all persons with respect to such sum or sums.

Added by St.1973, c. 857.

### Historical Note

St.1973, c. 857, was approved Oct. 2, 1973. Emergency declaration by the Governor was filed Oct. 3, 1973.

### Library References

States ⊕64.1(3). C.J.S. States § 94.

## § 19C. Collective bargaining; submission to arbitration

Notwithstanding the provisions of sections nineteen and ninteeen A, the authority or any organizations representing employees of the authority shall not be permitted to submit any dispute over the terms of a collective bargaining agreement to arbitration except in accordance with sections nineteen C through nineteen G, inclusive; provided, however, that this section shall not limit the rights of organizations representing employees of the authority to submit grievances to arbitration in accordance with the collective bargaining agreement between the parties. Added by St.1978, c. 405, § 2.

**1978 Enactment.** St.1978, c. 405, § 2, was approved July 13, 1978, and by section 5 made effective upon its passage.

Sections 3 and 4 as amended by St.1979, c. 298, § 1, approved June 19, 1979 and by section 2 made effective July 13, 1978 provided:

"Section 3. Notwithstanding the provisions of any general or special law to the contrary, there shall be no salary adjustment awarded to any management employees of the authority for a period of eighteen months from the date of such employee's last salary adjustment; provided,

however, that the provisions of this section shall not apply to any cost-of-living adjustment for management employees who are covered in a collective bargaining agreement."

"Section 4. The provisions of this act are severable, and if any of its provisions shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions."

**Library References**

Labor Relations ⊕414.

C.J.S. Labor Relations § 405 et seq.

## § 19D. Mediation; selection of mediator; report; selection of arbitrator

In the event the directors and any organizations representing employees of the authority have not reached an agreement within ninety days from the date of the expiration of the agreement, either party may notify the other that it desires mediation. The parties may agree upon a person to serve as a mediator or, if unable to agree on said mediator, either party or the parties acting jointly may petition the board of conciliation and arbitration to appoint a mediator from a list of qualified persons maintained by the board.

After a reasonable period of mediation, not to exceed forty-five days from the date of appointment, said mediator shall issue a report indicating the results of his services in resolving the impasse. If at the conclusion of mediation, the mediator certifies that the impasse still exists, either party may notify the other that it desires arbitration of the matters in dispute. Within ten days of said notice, the parties shall meet to select a single neutral arbitrator. If, within fifteen days, the parties fail to select such single arbitrator, either party may forthwith petition the board of conciliation and arbitration to request a list of five arbitrators from

the American Arbitration Association and said Association shall certify to the board that such arbitrators on the list it provides possess the qualifications as provided in section nineteen E. The parties shall thereupon meet to select such arbitrator by striking one name each until one name remains and that person shall serve as the neutral arbitrator. If after ten days, if one of the parties declines to strike their names, the other party shall strike two names and the board shall forthwith select the arbitrator from the remaining three names.

Added by St.1978, c. 405, § 2.

**1978 Enactment.** St.1978, c. 405, § 2, was approved July 13, 1978.

**Library References**
Labor Relations ⬅414, 453.
C.J.S. Labor Relations §§ 405 et seq., 464, 465.

## § 19E. Qualifications of arbitrator

The single arbitrator, whether agreed upon by the parties or selected by the board of conciliation and arbitration, shall be a legal resident of the commonwealth and shall be experienced in state and local finance.

Added by St.1978, c. 405, § 2.

**1978 Enactment.** St.1978, c. 405, § 2, was approved July 13, 1978.

**Library References**
Labor Relations ⬅453.
C.J.S. Labor Relations §§ 464, 465.

## § 19F. Factors in determining the basis for award

The arbitrator shall rely primarily on the following factors in determining the basis for an award:

1. The financial ability of the authority to meet additional costs, which shall include but not be limited to:

a. the statutory requirement of advisory board approval of the authority's fiscal budget;

b. the financial ability of the individual communities and the commonwealth to meet additional costs;

c. the average per capita tax burden, average annual income and sources of revenue within the commonwealth, and the effect of any arbitration award on the respective property tax rates of the cities and towns within the authority's district.

2. The overall compensation presently received by the employees, having regard not only for wages for time actually worked but also for wages for time not worked, including vacations, holidays and other excused time.

3. All benefits received by the employees, including insurance, pension, as well as the continuity and stability of employment.

4. The hazards of employment, physical, educational and mental qualifications, job training and skills involved.

5. A comparison of wages, hours, and conditions of employment of the employees involved in the arbitration proceedings with the wages, hours and conditions of employment of other employees performing similar services within the commonwealth and with other employees generally in public and private employment within the commonwealth.

6. The average consumer price for goods and services, commonly known as the cost of living.

7. Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

8. Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between parties, in the public service of the commonwealth, and which are not precluded from bargaining under section nineteen.

9. The stipulation of the parties.

Added by St.1978, c. 405, § 2. Amended by St.1980, c. 581, § 9.

**1978 Enactment.** St.1978, c. 405, § 2, was approved July 13, 1978.

**1980 Amendment.** St.1980, c. 581, § 9, in par. 8, added ", and which are not precluded from bargaining under section nineteen".

Section 25 of St.1980, c. 581, provided: "The provisions of this act are severable, and if any of its provisions or an application thereof shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions or other applications thereof."

St.1980, c. 581 was approved Dec. 7, 1980. Emergency declaration by the governor was filed Dec. 8, 1980.

**Library References**
Labor Relations ⬅457.
C.J.S. Labor Relations § 473.

### § 19G. Written opinion of arbitrator; binding nature; scope of arbitration; cost of mediation and arbitration

Within thirty calendar days of an award, the arbitrator shall issue a written opinion inclusive of an analysis of all statutory factors applicable to the proceedings. Any determination by the arbitrator, if supported by material and substantial evidence on the record, shall be binding upon the parties and upon the appropriate legislative or appropriating body and may be enforced at the insistence of either party or by the arbitrator in the superior court. The scope of arbitration shall be limited to wages, hours, and conditions of employment and shall not include any provisions for any cost of living adjustments which are based on changes in the Consumer Price Index after the expiration of the contract period covered by the award. In addition, any wage or salary adjustments shall be expressed in per cent or dollar amounts, and in no case shall there be any provision for salary adjustments to occur after the expiration of the contract period covered by the award.

The cost, if any, of the mediation and of arbitration proceedings exclusive of the expenses of the individual parties provided for under sections nineteen C through nineteen G shall be divided equally by the parties and shall be in accordance with a schedule of payments established by the American Arbitration Association. Added by St.1978, c. 405, § 2.

ACTS, 1980. – Chap. 581.

### THE COMMONWEALTH OF MASSACHUSETTS

Advance Copy 1980 Acts and Resolves

MICHAEL JOSEPH CONNOLLY, State Secretary

Chap. 581. AN ACT RELATIVE TO THE STRUCTURE OF THE MASSACHUSETTS BAY TRANSPORTATION AUTHORITY.

*Be it enacted, etc., as follows:*

SECTION 1. Section ninety-one A of chapter one hundred and sixty-one of the General Laws is hereby repealed.

SECTION 2. Section 3 of chapter 161A of the General Laws is hereby amended by striking out paragraph (*d*), as most recently amended by section 6 of chapter 1140 of the acts of 1973, and inserting in place thereof the following paragraph:-

(*d*) To appoint and employ officers, including a general manager, agents, and employees to serve at the pleasure of the directors, except as may otherwise be provided in collective bargaining agreements, and to fix their compensation and conditions of employment; provided, however, the authority may bind itself by contract to employ not more than five senior officers but no such contract shall be for a period of more than five years. The advisory board shall approve the appointment of a general manager.

The authority shall annually, on or before January first, submit a schedule of salaries of all its employees and any proposed increases therein to the secretary of administration for his review. Said secretary may make recommendations to the authority on said salary structure and shall advise the authority of the prevailing rates that the commonwealth pays for similar services.

SECTION 3. Said chapter 161A is hereby further amended by striking out section 6, as most recently amended by section 10 of said chapter 1140, and inserting in place thereof the following section:-

*Section 6.* The authority shall be managed by a board of seven directors, hereinafter in this chapter called the directors, one of whom shall be the secretary, who shall be the chairman and shall not be compensated therefor, six of whom shall be appointed by the governor and who shall serve *coterminus* with the governor, one with the approval of the advisory board, one with the approval of the fourteen cities and towns, and one with the approval of the sixty-four cities and towns. The approval of the fourteen cities and towns shall be determined by a majority vote of their mayors, or city managers in the cases of Plan D or Plan E cities, and chairmen of the boards of selectmen and town managers in towns having a town council form of government with the vote of each city and town counted as on said advisory board; provided that fifty per cent or more of the total votes as set forth in said section seven is represented at such meeting. The approval of the advisory board and of the sixty-four cities and towns shall be determined by a majority vote of their mayors or city managers and chairmen of selectmen or town managers present and voting thereon with the vote of each city and town counted as on said advisory board; provided that fifty per cent or more of the total votes as set forth in said section seven is represented at such meeting. One of the appointees of the governor shall be experienced in transportation, one a member of organized labor who shall be a member of a national or international labor organization, and one experienced in administration and finance. No more than four of the seven directors shall be members of the same political party. Two of the appointees of the governor shall not be residents of the area constituting the authority.

Any director except the chairman may be removed for cause by the governor and any vacancy in the office of a director shall be filled, by appointment of the governor with the approval applicable to such under the provisions of section three of chapter twelve shall not apply to said board of directors. The six directors appointed by the governor shall receive a salary of seven thousand five hundred dollars. A majority of the directors shall constitute a quorum, but a majority vote of the entire membership of the board of directors shall be required to take any particular action.

SECTION 4. Said chapter 161A is hereby further amended by inserting after section 7 the following section:-

*Section 7A.* A designee of the governor shall be a member of the advisory board, and shall have the same number of votes on said board as the city or town with the greatest number of votes on said board; provided, however, that the designee shall not be considered a voting member on the approval of any appointment to the board of directors, or the position of general manager; provided, further, that in any case where the designee of the governor, and said city or town with the greatest number of votes shall vote the same, their combined vote shall equal the vote of said city or town; and provided, further, that an affirmative vote of at least one-third of the cities and towns present and voting shall be required for approval of any action or appointment.

The number of votes of such designee shall be in addition to the total number of votes of each city and town as determined by the authority, based upon the most recent annual assessment.

SECTION 5. Said chapter 161A is hereby further amended ·by inserting after section 11 the following section:-

*Section 11A.* Any of the sixty-four cities and towns may for the purpose of providing local·bus service enter into agreements with any person lawfully authorized to operate any motor bus on any public way therein for the carrying of passengers for hire.

Said city or town shall have the same powers and duties in respect to such private bus carriers as are provided by law for the department of public utilities, except as to safety of equipment and operations, schedules, and routes not being, however, considered safety of equipment and operations for purposes of this paragraph; and provided that the authority shall be notified of the

establishment of any such contract local service, but shall not have control or jurisdiction over said service.

SECTION 6. The third paragraph of section 12 of said chapter 1964, is hereby amended by adding the following sentence:—The authority shall consult with the finance advisory board established by section ninety-seven of chapter six prior to the sale of any such notes as to the timing and terms thereof.

SECTION 7. Subsection (a) of section 12A of said chapter 161A, as appearing in section 15 of chapter 4 of the acts of 1976, is hereby amended by adding the following sentence:—The authority shall consult with the finance advisory board established by section ninety-seven of chapter six prior to the sale of any such notes as to the timing and terms thereof.

SECTION 8. Section 19 of said chapter 161A is hereby amended by striking out the first sentence, as appearing in section 18 of chapter 563 of the acts of 1964, and inserting in place thereof the following sentences:—The directors shall have authority to bargain collectively with labor organizations representing employees of the authority and to enter into agreements, with such organizations relative to wages, salaries, hours, working conditions, health benefits, pensions and retirement allowances of such employees; provided, however, that the directors shall have no authority to bargain collectively and shall have no authority to enter into collective bargaining agreements with respect to matters of inherent management right which shall include the right:

(i) to direct, appoint, employ, assign and promote officers, agents and employees and to determine the standards therefor.

(ii)(A) to discharge and terminate employees subject to the provisions of such clauses (B) and (C).

(B) No action set forth in (A) shall be sustained if, in a proceeding invoked in accordance with the provisions of such clause (C), the employee shall establish by a preponderance of the evidence that it was based upon race, color, religion, sex, age, national origin, handicapping condition, marital status, or political affiliation or activities or union activities or union organizing of the employees; a reprisal against the employee for disclosure of information by an employee which the employee reasonably believes evidences a violation of any law, rule or regulation or mismanagement, a gross waste of funds, or abuse of authority; a reprisal against any employee for the refusal of any person to engage in political activity.

(C) The parties may include in any written agreement a grievance procedure culminating in final and binding arbitration which may be invoked in the event any employee of the authority is aggrieved by any action taken under such clause (A).

(iii) to plan and determine the levels of service provided by the authority.

(iv) to direct, supervise, control, and evaluate the departments, units, and programs of the authority; to classify the various positions of the authority and ascribe duties and standards of productivity therefor.

(v) to develop and determine levels of staffing and training.

(vi) to determine whether goods or services should be made, leased, contracted for, or purchased on either a temporary or permanent basis.

(vii) to assign and apportion overtime.

(viii) to hire part-time employees.

The authority is hereby prohibited from bargaining collectively or entering into any agreement to make pension benefit payments to its employees that are determined in a manner that includes the amount of overtime earnings of said employees.

The authority is hereby prohibited from bargaining collectively or entering into a contract which provides for automatic cost-of-living salary adjustments which are based on changes in the Consumer Price Index or other similar adjustments unless specifically authorized by law.

SECTION 9. Section 19F of said chapter 161A, as appearing in section 2 of chapter 405 of the acts of 1978, is hereby amended

by striking out paragraph 8 and inserting in place thereof the following paragraph:—

8. Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between parties, in the public service of the commonwealth, and which are not precluded from bargaining under section nineteen.

SECTION 10. The second paragraph of section 23 of said chapter 161A, as appearing in section 18 of chapter 563 of the acts of 1964, is hereby amended by adding the following sentence:—No bonds of the authority shall be sold by the authority unless prior to such sale the authority shall have consulted with the finance advisory board established by section ninety-seven of chapter six as to the timing and terms thereof.

SECTION 11. The fourth paragraph of said section 23 of said chapter 161A, as amended by section 3 of chapter 650 of the acts of 1965, is hereby further amended by striking out the last sentence and inserting in place thereof the following sentence:— Subject to the requirement of consultation with the finance advisory board established by section ninety-seven of chapter six, the authority may sell such bonds in such manner, either at public or private sale, and for such price as it may determine to be for the best interests of the authority.

SECTION 12. Said chapter 161A is hereby further amended by striking out section 29, as appearing in section 18 of chapter 563 of the acts of 1964, and inserting in place thereof the following section:—

Section 29. The authority is authorized and directed from time to time to take all necessary action to secure any federal assistance which is or may become available to the commonwealth or any of its political subdivisions, for any of the purposes of this chapter. If any federal law, administrative regulations or practice requires any action relating to such federal assistance to be taken by any department or instrumentality of the commonwealth other than the authority, such other department or instrumentality is authorized and directed to take all such action, including without limitation filing applications for assistance, supervising the expenditure of federal grants or loans to the foregoing, and the authority is hereby authorized and directed to take all actions which are not inconsistent with state law and which are necessary to permit such other department or instrumentality to comply with federal requirements. If the provisions of any federal law, administrative regulation, or practice governing federal assistance for the purposes of this chapter are inconsistent with any provisions of this chapter to the extent that the commonwealth or its political subdivisions are prohibited or potentially prohibited from receiving such assistance, the chairman of the authority shall, within thirty days after the federal government has notified him that an inconsistency may exist, notify the governor, and the clerks of the house and senate of such inconsistency.

SECTION 13. Chapter 151 of the acts of 1979 is hereby amended by striking out section 8A and inserting in place thereof the following two sections:—

Section 8A. The budget of the Massachusetts Bay Transportation Authority shall not be greater than one hundred and four per cent of the budget approved for said authority for the preceding fiscal year, provided, however, that said budget may be increased by those amounts approved in accordance with section eight B.

Section 8B. The Massachusetts Bay Transportation Authority may increase the budget limit imposed by section eight A by the approval of a specified amount by a two-thirds vote of the members of the advisory board present and voting.

SECTION 14. Section 16 of said chapter 151 is amended by adding the following at the end thereof:-

; provided, however, that sections eight A and eight B shall not expire until December thirty-first, nineteen hundred and eighty-three, and the provisions of section two, and sections 15A through 15E inclu-

sive, insofar as applicable to the provisions of section eight A, shall not expire until December thirty-first, nineteen hundred and eighty-three.

SECTION 15. The directors of the authority, and each of the bargaining units within the authority, are hereby directed to establish for each said bargaining unit a productivity and conduct committee to be composed of three members of management chosen by the directors and three members of the respective bargaining unit, to be chosen by the officers thereof.

Said committees shall recommend the establishment of standards of productivity, and conduct of employees for each respective bargaining unit no later than June thirtieth, nineteen hundred and eighty-one.

The directors shall review, revise and implement said standards no later than thirty days after receiving such recommendations, and shall file a report with the clerk of the house of representatives on each set of standards as they are implemented.

SECTION 16. The authority is hereby authorized and directed to develop, implement and utilize an equipment maintenance information recording system for the authority. The authority shall establish a joint labor-management committee for the purpose of providing consultation and cooperation in the development of said equipment maintenance information recording system. Said systems reporting requirements shall include, but not be limited to, vehicle numbers, defects reported, defects found, cause determination, action taken, by whom, and duration of repair. Said system is to be developed, approved by the authority's board of directors, implemented in the automotive equipment maintenance department, and a report outlining said system filed in the office of the house clerk no later than the first Wednesday of January, nineteen hundred and eighty-two.

The clerk shall forward said report to the joint committees on transportation and post audit and oversight, and the report shall be reviewed by a subcommittee of the post audit and oversight committee, which shall be appointed by the chairman thereof.

Said subcommittee, in consultation with the transportation committee may make such recommendations as they deem necessary to the authority with regard to said information system.

Said systems will be initially implemented in the automotive department and upon acceptance by the authority initiated in all other equipment maintenance departments as it applies to said departments.

SECTION 17. Commencing with the commonwealth's fiscal year nineteen hundred and eighty-four, beginning on July first, nineteen hundred and eighty-three, the Massachusetts Bay Transportation Authority shall operate on a fiscal year cycle coinciding with that of the commonwealth.

The board of directors of said authority shall prepare a plan to implement said fiscal year change and shall submit for approval said plan to the secretary of administration and finance not later than the first Wednesday of December, nineteen hundred and eighty-one.

Notwithstanding any general or special law to the contrary, commencing with the commonwealth's fiscal year nineteen hundred and eighty-four, all expenses of the authority shall be in accordance with an itemized budget. The authority, in consultation with the secretary of transportation and the advisory board, shall prepare and shall submit such budget for the ensuing fiscal year to the secretary and the advisory board not later than the date set by the commissioner of administration pursuant to section three of chapter twenty-nine of the General Laws for the submission of statements to the budget director.

The secretary shall review and make recommendations regarding such budget within thirty days after submission.

Within forty-five days after submission, the advisory board shall approve said budget as submitted or subject it to such itemized reductions therein as the advisory board shall deem appropriate. Such itemized reductions shall be accompanied by a clear delineation of the areas of services to

be reduced and the degree of reduction of service including a statement by location, line, and mode of the level of maintainable service resulting from such itemized reduction. The advisory board shall vote on each item within the authority's budget and may subject the authority's proposed budget to itemized reductions as the advisory board may deem appropriate. The board of directors shall, no later than the first Wednesday in December file a copy of such budget with the governor. Said budget shall include all requests and recommendations of the authority for capital outlay programs and projects for the ensuing year.

Within three weeks after the convening of the general court the governor shall file a copy of the budget with the clerk of the house of representatives and the clerk of the senate. Said budget shall include all requests and recommendations of the authority for capital outlay programs and projects for the ensuing year.

The governor shall include as a line item within the budget submitted pursuant to Section 2 of Article LXIII of the Amendments to the Constitution his recommendation for the share of the net cost of service at the Massachusetts Bay Transportation Authority to be paid by the commonwealth.

SECTION 18. Notwithstanding the provisions of subsection (*i*) of section five of chapter one hundred and sixty-one A of the General Laws, chapter one hundred and fifty-one of the acts of nineteen hundred and seventy-nine, section twenty-seven C of chapter twenty-nine of the General Laws and of section twenty A of chapter fifty-nine of the General Laws, the board of directors of the Massachusetts Bay Transportation Authority may by an affirmative vote of the directors, approve and restore to the budget for the calendar year nineteen hundred and eighty any or all itemized reductions which the advisory board may make or may have made in any budget or supplementary budget submitted to it; provided, however, that the amounts so approved and so restored to any such budgets shall not cause it to exceed the total sum of three hundred and forty-three million one

hundred and sixty-six thousand eight hundred and forty-six dollars; and provided, further, that no amount in excess of three hundred and forty-three million dollars shall be spent unless the authority conducts its labor negotiations in accordance with chapter four hundred and five of the acts of nineteen hundred and seventy-eight. Said budget shall cover all expenditures incurred by the Massachusetts Bay Transportation Authority board of directors during calendar year nineteen hundred and eighty, including without limitation those costs incurred pursuant to Executive Order No. 189, issued on November eighteenth, nineteen hundred and eighty. The Local Aid Fund shall not be reduced by the amount of any funds restored pursuant to this section.

SECTION 19. In addition to the contract assistance authorized to be provided in section twenty-eight of chapter one hundred and sixty-one A of the General Laws, the commonwealth, acting by and through the executive office of administration and finance, may enter into an additional contract with the Massachusetts Bay Transportation Authority for contract assistance of a portion of the net cost of the calendar 1980 budget approved by the Advisory Board. In addition, for said year, the commonwealth shall provide assistance equal to the seventy-five per cent of the net cost of service in excess of three hundred and two million, one hundred and thirty thousand, three hundred and seventy-seven dollars authorized by the advisory board for operation of the authority for such year.

SECTION 20. One-third of said additional net cost of service assumed by the commonwealth pursuant to section fourteen C shall be included in any determination of total costs, charges, or fees, under the provisions of section twenty A of chapter fifty-nine of the General Laws, for the cities and towns within the jurisdiction of the authority.

SECTION 21. Section twenty A of chapter fifty-nine of the General Laws, as inserted by section twelve of chapter five hundred and eighty of the acts of nineteen hundred and eighty, shall apply to costs

assessed upon member cities and towns of the Massachusetts Bay Transportation Authority, for the operation thereof, beginning calendar year nineteen hundred and eighty-one.

SECTION 22. The board of directors serving on the effective date of this act shall continue to serve until their successors are duly appointed.

SECTION 23. All positions vacant or which become vacant, on or after the effective date of this act, shall remain vacant; provided, that vacancies for which there exists a critical need may be filled upon certification of said critical need by the secretary of administration and finance; and provided, further, that said secretary shall report quarterly to the house and senate committees on ways and means the number, salary, title and job descriptions of all persons hired under the provisions of this section. No employee shall be terminated as part of any reduction in force, which result from enactment of this act, except in accordance with the provisions of the collective bargaining agreement in effect on the date of such termination.

SECTION 24. Section four of this act shall become inoperative on July first, nineteen hundred and eighty-three.

SECTION 25. The provisions of this act are severable, and if any of its provisions or an application thereof shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions or other applications thereof.

Approved December 7, 1980.
EMERGENCY LETTER
December 8, 1980 @ 12:46 PM

## § 1609. Labor standards
### Action of Secretary

(a) The Secretary shall take such action as may be necessary to insure that all laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed with the assistance of loans or grants under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended. The Secretary shall not approve any such loan or grant without first obtaining adequate assurance that required labor standards will be maintained upon the construction work.

### Authority of Secretary of Labor

(b) The Secretary of Labor shall have, with respect to the labor standards specified in subsection (a) of this section, the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267), and section 276c of Title 40.

### Interests of employees; protective arrangements; terms and conditions

(c) It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

Pub.L. 88–365, § 13, formerly § 10, July 9, 1964, 78 Stat. 307, renumbered and amended Pub.L. 89–562, § 2(a)(1), (b)(2), Sept. 8,

1966, 80 Stat. 715, 716; Pub.L. 90–19, § 20(a), May 25, 1967, 81 Stat. 25.

## AGREEMENT PURSUANT TO SECTION 13(c) OF THE URBAN MASS TRANSPORTATION ACT OF 1964, AS AMENDED.

This agreement is made and entered into by and between the Massachusetts Bay Transportation Authority ("Authority"), party of the first part, and the labor organizations signatory hereto ("Unions"), party of the second part.

WHEREAS, the Authority has filed applications under the Urban Mass Transportation Act of 1964, as amended ("Act"), for a capital grant to finance (1) Plant and Facilities Improvements; (2) Acquisition and Installation of Plant Machinery and Equipment; (3) Acquisition of Non-Revenue Equipment and Rolling Stock; (4) Power and Signal System Improvements; (5) Acquisition and Installation of Bus Radios, entitled "Plant Improvements—Phase III", as more fully described in the project application dated December 21, 1973; (6) Bus Storage and Maintenance Facilities at Charlestown, as more fully described in the project application dated April 19, 1974; (7) Purchase of 203 New Buses; (8) Purchase of 276 New Buses, as more fully described in project applications dated April 17, 1974; and (9) Restoration of Track Support Structures, as more fully described in project application dated August 7, 1974; and Immediate Needs—Power Generation Improvements, as more fully described in project application dated October 28, 1974—("Project"); and

WHEREAS, section 13(c) of the Act requires, as a condition of any assistance thereunder, that fair and equitable arrangements be made, as determined by the Secretary of Labor, "to protect the interests of employees affected by such assistance"; and

WHEREAS, the Unions signatory hereto represent certain employees of the Authority and certain other private carrier employers in the area presently served by the Authority; and

WHEREAS, the scope and purpose of this agreement is to provide fair and equitable arrangements pursuant to Section 13(c) of the Act to protect the interests of employees affected by such assistance to the Project; and

WHEREAS, the following arrangements have been agreed upon by the parties hereto as fair and equitable;

NOW, THEREFORE, IT IS AGREED that in the event the Project is approved for assistance under the Act the following terms and conditions shall apply:

1. The phrase "as a result of the Project" shall, when used in this Agreement, include events occurring in anticipation of, during, and subsequent to the Project; provided, however, that fluctuations and changes in volume or character of employment brought about solely by other causes are not within the purview of this Agreement. The term "Project", as used in this Agreement shall not be limited to the particular facility assisted by federal funds, but shall include any changes, whether organizational, operational, technological or otherwise, which are traceable to the assistance provided, whether they are the subject of the grant contract, reasonably related thereto, or facilitated thereby.

2. The Project shall be carried out in such a manner and upon such terms and conditions as will not in any way adversely affect employees covered by this agreement.

3. (a) All rights, privileges (including pension rights and benefits) of employees of the Authority in classifications represented by the Labor Organizations signatory hereto (including employees already retired) under the existing collective bargaining agreements or otherwise shall be preserved and continued unless changed, altered or amended as provided in said collective bargaining agreements.

3. (b) The Authority shall similarly protect such rights, privileges and benefits of other employees covered by this agreement who are in the service area of the Authority against any worsening of such rights, privileges and benefits as a result of the Project.

4. The collective bargaining rights of employees of the Authority represented by Labor Organizations signatory hereto including the right to arbitrate labor disputes and to maintain union security and check-off arrangements, to the extent such are provided for by applicable laws and/or existing collective bargaining agreements, or otherwise shall be preserved and continued. If, at any time, applicable state law or the collective bargaining agreement permit or grant to the employees of the Authority the right to utilize any economic measures, nothing in this agreement shall be deemed to foreclose the exercise of such right.

5. (a) In the event the Authority contemplates any change in the organization or operation of its system as a result of the Project which may result in the dismissal, displacement or re-arrangement of the employees represented by the labor organizations signatory to this Agreement, the Authority shall do so only in accordance with the provisions of subparagraph (b) hereof.

(b) The Authority shall give to said labor organizations at least ninety (90) days written notice of such change by certified mail. Such notice shall contain a full and adequate statement of the proposed changes, including the approximate number of employees and classifications which may be affected by such change, and the number and classification of any jobs with the Authority which are available and may be filled by such affected employees.

At the request of either the Authority or the representatives of the affected employees, negotiations for the purpose of reaching agreement with respect to application of the terms and conditions of this agreement shall commence immediately. These negotiations shall include determining the selection of forces from among the employees of other carrier employers who may be affected as a result of the Project, to establish which such employees shall be offered employment with the Authority for which they are qualified or can be trained; not, however, in contravention of collective bargaining agreements relating thereto. If no agreement is reached within thirty (30) days from the commencement of negotiations, any party to the dispute may submit it in accordance with the procedures contained in paragraph 13(a) hereof.

6. (a) Whenever an employee retained in service, recalled to service, or employed pursuant to paragraphs 5, 7(e), or 14 hereof is placed in a worse position with respect to compensation as a result of the Project, he shall be paid a monthly "displacement allowance" to be determined in accordance with this paragraph. Said displacement allowance shall be paid each displaced employee during the protective period following the date on which he is first "displaced" and shall continue during the protective period so long as the employee is unable, in the exercise of his seniority rights, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, adjusted to reflect subsequent general wage adjustments, including cost of living adjustments.

(b) The displacement allowance shall be a monthly allowance determined by computing the total compensation received by the employee, including vacation allowances, monthly compensation guarantees and any other pay allowances or guarantees, and his total time paid for during the last twelve (12) months in which he performed compensated service more than fifty per centum of each such months, based upon his normal work schedule, immediately preceding the date of his displacement as a result of the Project, and by dividing separately the total compensation and the total time paid for by twelve (12), thereby producing the average monthly compensation and the average monthly time paid for. Such allowance shall be adjusted to reflect subsequent general wage adjustments, including cost of living adjustments. If the displaced employee's compensation in his current position is less in any month during his protective period than the aforesaid average compensation (adjusted to reflect subsequent general wage adjustments, including cost of living adjustments), he shall be paid the difference, less compensation for any time

lost on account of voluntary absences to the extent that he is not available for service equivalent to his average monthly time, but he shall be compensated in addition thereto at the rate of the current position for any time worked in excess of the average monthly time paid for. If the displaced employee fails to exercise his seniority rights to secure another position available to him which does not require a change in his place of residence to which he is entitled under the then-existing collective bargaining agreement, and which carries a wage rate and compensation equal to or exceeding those of the position which he elects to retain he shall thereafter be treated, for the purposes of this paragraph, as occupying the position he elects to decline.

(c) The displacement allowance shall cease prior to the expiration of the protective period in the event of the displaced employee's resignation, death, retirement, or dismissal for cause.

7. (a) Whenever any employee is laid off or otherwise deprived of employment as a result of the Project, in accordance with any collective bargaining agreement applicable to his employment, he shall be considered a "dismissed employee" and shall be paid a monthly dismissal allowance to be determined in accordance with this paragraph. Said dismissal allowance shall first be paid each dismissed employee on the thirtieth (30th) day following the day on which he is "dismissed" and shall continue during the protective period, as follows:

| Employee's length of service prior to adverse effect | Period of Protection |
|---|---|
| 1 day to 6 years | equivalent period |
| 6 years or more | 6 years |

The monthly dismissal allowance shall be equivalent to one-twelfth (1/12th) of the total compensation received by him in the last twelve (12) months of his employment in which he performed compensation service more than 50 per centum of each such month based on his normal work schedule to the date on which he was first deprived of employment as a result of the Project. Such allowance shall be adjusted to reflect subsequent general wage adjustments, including cost of living adjustments.

(b) An employee shall be regarded as deprived of employment and entitled to a dismissal allowance when the position he holds is abolished as a result of the Project or when the position he holds is not abolished but he loses that position as a result of the exercise of seniority rights by an employee whose position is abolished as a result of the Project or as a result of the exercise of seniority rights by other employees brought about as a result of the Project; and he is unable to obtain another position, either by the exercise of his seniority rights, or through the Authority, in accordance with subparagraph (e). In the absence of

proper notice followed by such an agreement or award pursuant to paragraph 5 hereof, no employee who has been deprived of employment as a result of the Project shall be required to exercise his seniority rights to secure another position in order to qualify for a dismissal allowance hereunder.

(c) Each employee receiving a dismissal allowance shall keep the Authority informed as to his current address and the current name and address of any other person by whom he may be regularly employed, or if he is self-employed.

(d) The dismissal allowance shall be paid to the regularly assigned incumbent of the position abolished. If the position of an employee is abolished when he is absent from service he will be entitled to the dismissal allowance when he is available for service. The employee temporarily filling said position at the time it was abolished will be given a dismissal allowance on the basis of that position, until the regular employee is available for service, and thereafter shall revert to his previous status and will be given the protections of the agreement in said position, if any are due him.

(e) An employee receiving a dismissal allowance shall be subject to call to return to service by his former employee after being notified in accordance with the terms of the then existing collective bargaining agreement. Prior to such call to return to work by his employer, he may be required by the Authority to accept reasonably comparable employment which carries a wage rate and compensation equal to or exceeding that of his former position adjusted to reflect subsequent wage increases and cost of living adjustments, and for which he is physically and mentally qualified or for which he can become qualified after a reasonable training or retraining period, provided it does not require a change in residence or infringe upon the employment rights of other employees under then existing collective bargaining agreements.

(f) When an employee who is receiving a dismissal allowance again commences employment in accordance with subparagraph 7(e) above, said allowance shall cease while he is so reemployed and the period of time during which he is so reemployed shall be deducted from the total period for which he is entitled to receive a dismissal allowance. During the time of such reemployment, he shall be entitled to the protections of this Agreement to the extent they are applicable.

(g) The dismissal allowance of any employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings from such other employment or self-employment, any benefits received from any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his union representative, and the Authority shall agree upon a procedure by which the Authority shall be kept currently informed of the earnings of such employee in employment other than with his former employer, including self-employment, and the benefits received.

(h) The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service in accordance with the working agreement or to accept employment as provided under subparagraph (e) above, or in the event of his resignation, death, retirement, or dismissal for cause.

8. In determining length of service of a dismissed employee for purposes of this agreement, such employee shall be given full seniority credits in accordance with the records and labor agreements applicable to him in his former employment and he shall be given continuing seniority credits for each month in which he receives a dismissal allowance as if he were continuing to perform services for his former employer, provided, however, that this paragraph shall not be deemed to enlarge upon the employee's protective period as defined in paragraph 18, nor to enlarge upon the benefit levels otherwise provided by this agreement.

9. No employee receiving a dismissal allowance shall be deprived during the protective period of any benefits attached to his previous employment, such as group life insurance, hospitalization, medical care and free transportation, as well as any other benefits to which he may be entitled under the same conditions and so long as the benefits continue to be accorded to other employees of the bargaining unit, in active service or laid off, as the case may be.

10. (a) Any employee covered by this Agreement who is retained in the service of his employer, or who is later restored to service after being entitled to receive a dismissal allowance, and who is required to change the point of his employment in order to retain or secure active employment with his employer, or the Authority in accordance with this Agreement, and who is required to move his place of residence, shall be reimbursed for all expenses of moving his household and other personal effects, for the traveling expenses for himself and his immediate family, including living expenses for himself and his immediate family, and for his own actual wage loss during the time necessary for such transfer and for a reasonable time thereafter, not to

exceed five (5) working days. The exact extent of the responsibility of the Authority under this paragraph, and the ways and means of transportation, shall be agreed upon in advance between the Authority and the affected employee or the representative. No claim for reimbursement shall be paid under the provisions of this paragraph unless such claim is presented to the Authority within ninety (90) days after the date on which the expenses were incurred.

(b) If any such employee is laid off within three (3) years after changing his point of employment in accordance with paragraph (a) hereof and elects to move his place of residence back to his original point of employment, the Authority shall, to the same extent provided in subparagraph (a) hereof, assume the expense of moving his household and other personal effects.

(c) Except as otherwise provided in subparagraph (b), changes in places of residence, subsequent to the initial changes as a result of the Project, which are not the result of the Project but grow out of the normal exercise of seniority rights, shall not be considered to be within the purview of this paragraph.

11. (a) The following conditions shall apply to the extent they are applicable in each instance to any employee who is retained in the service of his employer (or who is later restored to service after being entitled to receive a dismissal allowance) who is required to change the point of his employment as a result of the Project, and is thereby required to move his place of residence:

If the employee owns his own home in the locality from which he is required to move, he shall, at his option, be reimbursed by the Authority for any loss suffered in the sale of his home for less than its fair market value, plus conventional fees and closing costs, such loss to be paid within thirty (30) days of settlement or closing on the sale of the home. In each case, the fair market value of the home in question shall be determined, as of a date sufficiently prior to the date of the Project so as to be unaffected thereby. The Authority shall, in each instance, be afforded an opportunity to purchase the home at such fair market value before it is sold by the employee to any other person and to reimburse the seller for his conventional fees and closing costs.

If the employee is under a contract to purchase his home, the Authority shall protect him against loss under such contract, and, in addition, shall relieve him from any further obligation thereunder.

If the employee holds an unexpired lease of a dwelling occupied by him as his home, the Authority shall protect him from all loss and cost in securing the cancellation of said lease.

(b) No claim for loss shall be paid under the provisions of this paragraph unless such claim is presented to the Authority within ninety (90) days after the date the employee is required to move.

(c) Should a controversy arise in respect to the value of the home, the loss sustained in its sale, the loss under a contract for purchase, loss and cost in securing termination of a lease, or any other question in connection with these matters, it shall be decided through a joint conference between the employee, or his union representative, and the Authority. In the event they are unable to agree, the dispute or controversy may be referred by the Authority or the union to a board of competent real estate appraisers selected in the following manner: one (1) to be selected by the representatives of the employee and one (1) by the Authority and these two, if unable to agree within thirty (30) days upon the valuation, shall endeavor by agreement within ten (10) days thereafter to select a third appraiser or to agree to a method by which a third appraiser shall be selected, and failing such agreement, either party may request the real estate commission of Massachusetts to designate within ten (10) days a third appraiser, whose designation will be binding upon the parties. A decision of a majority of the appraisers shall be required and said decision shall be final and conclusive. The salary and expenses of the neutral appraiser, including expenses of the appraisal board, shall be borne equally by the parties

to the proceedings. All other expenses shall be paid by the party incurring them, including the compensation of the appraiser selected by such party.

(d) The phrase "change in residence", when used in this agreement shall have the following meanings:

1. When the employees of the Authority represented by the Labor Organizations signatory to this Agreement are so affected—said phrase shall mean a transfer to a work location which is located outside the radius of 20 miles of the employee's former work location and farther from his residence than was his former work location.

2. When the employees of private mass transportation carriers represented by the Labor Organizations signatory to this Agreement are so affected—said phrase shall mean transfer to a work location which is located more than 30 normal highway route miles from his residence and also farther from his residence than was his former location.

12. If any employer of the employees covered by this Agreement or the Authority shall have rearranged or adjusted its forces in anticipation of the Project, with the effect of depriving an employee of benefits to which he should be entitled under this agreement, the provisions of this agreement shall apply to such employee as of the date when he was so affected.

13. (a) In the event there arises any dispute or controversy (except as defined in paragraph 11 hereof) with respect to the protection afforded by this Agreement, or with respect to the interpretation, application or enforcement of the provisions of this Agreement, which cannot be settled by the parties hereto within thirty (30) days after the dispute or controversy first arises, it may be submitted at the written request of any such party to final and binding arbitration or adjustment in accordance with the following arrangements:

(1) Any such labor dispute involving solely employees of the Authority covered by this Agreement shall be referred to arbitration in accordance with the arbitration procedures set forth in any then-applicable collective bargaining agreement between the Authority and the Union representing such employees. The term "labor dispute", as used in this paragraph, shall be broadly construed and shall include any controversy concerning wages, salaries, hours, working conditions, or benefits, including health and welfare, sick leave, insurance or pension or retirement provisions, the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, the interpretation or application of such agreements, the adjustment of grievances, and any claim, difference, or controversy arising out of, or by virtue of, the within arrangements for the protection of employees.

(2) Any such labor dispute involving solely employees covered by this agreement who are subject to the Railway Labor Act, as amended, shall be referred for adjustment in accordance with the terms of said Act, provided that if the Authority shall not have the power to invoke such procedures, it may refer such dispute to arbitration pursuant to the Rules of the American Arbitration Association.

(3) Any other labor dispute involving multiple parties or otherwise outside the scope of the foregoing subparagraphs (1) or (2) shall be submitted, at the written request of any of the parties to this Agreement, to a single arbitrator mutually acceptable to the parties involved in the dispute. Failing mutual agreement within thirty (30) days as to the selection of an arbitrator, the parties involved shall request the Secretary of Labor to appoint an arbitrator. The arbitrator shall convene the hearing within fifteen (15) days after his selection or appointment and shall render his decision within forty-five (45) days after the hearing of the dispute or controversy has been concluded and the record closed.

(b) Authority of the arbitrator or Board of Arbitrators shall be limited to the determination of the dispute or controversy arising out of the interpretation, application or

operation of the provisions of this Agreement. The Arbitrator or Board of Arbitration shall not have any authority whatsoever to alter, amend, or modify any of the provisions of any existing collective bargaining agreement.

(c) The salaries and expenses of the neutral member, any any other jointly incurred expenses, shall be borne equally by the parties to the proceeding and all other expenses shall be paid by the party incurring them.

(d) In the event of any dispute as to whether or not a particular employee was laid off or otherwise deprived of employment, placed in a worse position with respect to his employment, or required to change his place of residence as a result of the Project, it shall be such employee's obligation to specify, if possible, the adverse effect which he has suffered. It shall then be the Authority's burden to establish affirmatively that any such deprivation, worsening of employment, or change of residence as claimed by the employee, was not a result of the Project by proving that factors other than the Project affected the employee. The claiming employee shall prevail if it is established that the Project had an effect upon his employment even if other factors may also have affected the employee.

14. During his protective period a dismissed employee shall, if he so requests, be granted priority of employment or reemployment to fill any vacant position within the jurisdiction and control of the Authority, reasonably comparable to that which he held when dismissed, for which he is, or by training or retraining can become, qualified; not, however, in contravention of collective bargaining agreements relating thereto. In the event such employee requests such training or re-training to fill such vacant position, the Authority shall provide for such training or retraining at no cost to the employee. The employee shall be paid the salary or hourly rate provided for in the applicable collective bargaining agreement for such position, plus any displacement allowance to which he may be otherwise entitled. If such dismissed employee who has made such a request fails without good cause within ten (10) days to accept an offer of a position comparable to that which he held when dismissed for which he is qualified, or for which he has satisfactorily completed such training he shall, effective at the expiration of such ten (10) day period, forfeit all rights and benefits under this Agreement.

15. A dismissed employee entitled to protection under this agreement may, at his option, resign and (in lieu of all other benefits and protections provided in this Agreement or any other agreement) accept a lump sum payment computed in accordance with Section 9 of the Washington Job Protection Agreement of May, 1936.

16. The Authority will be financially responsible for the application of these conditions and will make the necessary arrangements so that any employee affected as a result of the Project may file a claim through his union representative with the Authority within sixty (60) days of the date he is terminated or laid off as a result of the Project, or within eighteen (18) months of the date his position with respect to his employment is otherwise worsened as a result of the Project, as provided by paragraph 6; provided, in the latter case, if the events giving rise to the claim have occurred over an extended period, the 18-month limitation shall be measured from the last such event. Unless such claims are filed with the Authority within said time limitations, the Authority thereafter will be relieved of all liabilities and obligations related to said claims. The Authority will honor the claim by making appropriate payments or will give notice to the claimant and his representative of the basis for denying or modifying such claim, giving reasons therefor. In the event the Authority fails to honor such claim, the union may invoke the following procedures for further joint investigation of the claim by giving notice in writing of its desire to pursue such procedures. Within ten (10) days from the receipt of such notice, the parties shall exchange such factual material as may be

requested of them relevant to the disposition of the claim; shall honor all reasonable requests for information; and shall jointly take such steps as may be necessary or desirable to obtain from any third party such additional factual material as may be relevant. In the event the claim is so rejected by the Authority, the claim may be processed to arbitration as hereinabove provided by paragraph 13. Prior to the arbitration hearing, the parties shall exchange a list of intended witnesses. In conjunction with such proceedings, the impartial arbitrator shall have the power to subpoena witnesses upon the request of any party and to compel the production of documents and other information which is relevant to the disposition of the claim.

17. Nothing in this Agreement shall be construed as depriving any employee of any rights or benefits which such employee may have under any existing job security or other protective conditions or arrangements by collective bargaining agreement or law, including Public Law 93–236, enacted January 2, 1974; provided that there shall be no duplication of benefits to any employees, and, provided further, that any benefit under this agreement shall be construed to include the conditions, responsibilities and obligations accompanying such benefit.

18. Whenever used herein, the term "protective period" means that period of time during which a displaced or dismissed employee is to be provided protection hereunder and extends from the date on which an employee is displaced or dismissed, to the expiration of six (6) years therefrom; provided, however, that the protective period for any particular employee during which he is entitled to receive the benefits of these provisions shall not continue for a longer period, following the date he was displaced or dismissed, then the employee's length of service, as shown by the records and labor agreement applicable to his employment prior to the date of his displacement or his dismissal. For purposes of determining the protective period of a particular employee, the employee's length of service shall be measured in accordance with section 7(b) of the Washington Job Protection Agreement of May, 1936.

19. No provisions, terms or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever by reason of any agreement made by the Authority with employers of employees covered by this Agreement.

20. In the event any provision of this Agreement is held to be invalid or otherwise unenforceable under applicable law, the remaining provisions of this Agreement shall not be affected, and the parties shall attempt to arrive at a mutually satisfactory agreement on an adequate replacement under section 13(c) of the Act. Failing to agree, any party may invoke arbitration under the provisions of paragraph 13 of this Agreement, to determine a substitute provision which shall be incorporated in this Agreement, and any other appropriate action, remedy, or relief.

21. Any other labor organization which is the certified or recognized collective bargaining representative of Mass Transportation employees in the service area of the Project, and who are effected by the Project within the meaning of 49 U.S.C.A. 1609(c), may give written notice of its intention to become a party to this Agreement to the original signatories and to the Secretary of Labor, within sixty (60) days of the date of the original execution of this Agreement.

If the original signatories to this Agreement do not agree that such labor organization should become a party, then the dispute as to whether such labor organization shall become a signatory shall be determined by the Secretary of Labor.

22. (a) It is the intent of this Agreement to provide employee protections which meet the requirements of Section 13(c) of the Act, and are not less than the benefits established pursuant to Section 5(2)(f) of the Interstate Commerce Act and Section 405(b) of the Rail Passenger Service Act of 1970, as amended. In so doing, changes in wording and organization from arrangements earlier developed under Section 5(2)(f) and section 405(b) have been neces-

**340**

sary to make such benefits applicable to this Project. In making such changes, it is not the intent of this Agreement to diminish such benefits. Thus, the terms of this Agreement are to be resolved in favor of this intent to provide employee protection and benefits no less than those established pursuant to Section 5(2)(f) of the Interstate Commerce Act and section 405(a).

(b) In the event the Authority should propose a change as a result of the Project which would constitute a "coordination" as defined by the Washington Agreement, or an acquisition of an existing transportation system as provided by Section 13(c)(4) of the Urban Mass Transportation Act, as amended, the Authority shall proceed with such coordination or acquisition only in accordance with the provisions of Sections 4 and 5 of the Washington Agreement.

23. In the event the Project is approved for assistance under the Act, the foregoing terms and conditions shall be made part of the contract of assistance between the Federal government and the applicant for Federal funds; provided, however, that this agreement shall not merge into the contract of assistance but shall be independently binding and enforceable by and upon the parties hereto, in accordance with its terms, nor shall any collective bargaining agreement merge into this Agreement, but each shall be independently binding and enforceable by and upon the parties thereto, in accordance with its terms.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their respective duly authorized representatives this 10th day of December, 1974.